WILCUTT (WALCOTT v.). See Case No. 17,053.

## Case No. 17,644.

### Ex parte WILD.

[The case reported under above title in 12 Blatchf. 42, is the same as Case No. 4,173.]

## Case No. 17,645.

### In re WILD.

[11 Blatchf. 243;[1] 1 Thomp. Nat. Bank Cas. 246; 8 Alb. Law J. 235; 10 N. B. R. 568.]

Circuit Court, S. D. New York. Aug. 12, 1873.

USURY BY NATIONAL BANK—STATE LAWS.

A national bank, located in the city of New York, made a loan there to a corporation, which, if it had been made to an individual, would have been usurious, under the law of New York, as a loan at a rate exceeding the rate of 7 per centum per annum, so that the securities taken for the loan would have been void. A statute of New York forbids a corporation to interpose the defence of usury. The effect of such statute, as construed by the highest court of the state, is, that the rate of interest which a corporation may pay is not fixed or limited. The 30th section of the national banking act of June 3, 1864 (13 Stat. 108), provides, that, when no rate of interest is fixed by the laws of a state, a national bank may charge a rate not exceeding 7 per centum, and that if it charges more, the entire interest shall be forfeited. *Held*, that the interest on the loan in question was forfeited.

[Cited in brief in Moniteau Nat. Bank v. Miller, 73 Mo. 189; National Bank of Auburn v. Lewis, 75 N. Y. 523; Peterborough Nat. Bank v. Childs, 133 Mass. 250.]

[Appeal from the district court of the United States for the Southern district of New York.

[The receiver of the Ocean National Bank claimed to be admitted as a creditor of the bankrupt, upon indorsements by him upon promissory notes of the Portage Lake & Lake Superior Ship Canal Company, a Michigan corporation. The assignee of the bankrupt resisted the claim, on the ground that the notes were usuriously discounted by the bank for the canal company. The claimant objected that this defense was not open to the bankrupt, under chapter 172 of the session laws of New York for 1850 (page 334), as expounded in Rosa v. Butterfield, 33 N. Y. 665, and Belmont Branch Bank v. Hoge, 35 N. Y. 65. The district court decreed in favor of the claimant, and admitted him as a creditor. (Case unreported.) The assignee of the bankrupt and also the bankrupt appealed to this court.][2]

Everett P. Wheeler and Francis S. Silvester, for assignee.

Francis N. Bangs, for receiver.

WOODRUFF, Circuit Judge. On the 13th of February, 1871, the bankrupt, Alfred Wild, without consideration, and as mere surety, became the endorser of two promissory notes made by the Portage Lake and Lake Superior Canal Company, one for $73,902.51, and the other for $35,111.49, which, on that day, were delivered to the Ocean National Bank, and were made payable with interest. These notes were given in renewal of a number of other notes then unpaid, which had been also given in renewal of prior notes held by the bank, and which were taken from the canal company for a loan of two sums of $75,000 each, made on and after the 7th of January, 1867, by the said bank. One of the sums was agreed, on the 5th of January aforesaid, to be loaned in form to the said canal company, and the other was at the same time agreed to be loaned to P. J. Avery, but is proved by the testimony, and was found by the referee in the district court, to have been in fact for the benefit of the canal company, who, in the accounts kept of the transaction, was treated as the actual debtor for both amounts. The reason assigned for giving to the transaction the form of two loans, one to the canal company and the other to P. J. Avery, was, that the national banking law prohibits an indebtedness by any one party, as borrower, to associations formed thereunder, to an amount greater than one-tenth of the capital of the association making the loan.

There is inconsistency, in permitting the bank, or its receiver, to make such a transaction, and avoid the charge of violating the banking act, by making it a loan in part to Avery, and in part only to the canal company, and, on the other hand, to avoid the

---

[1] [Reported by Hon. Samuel Blatchford, District Judge, and here reprinted by permission.]

[2] [From 10 N. B. R. 568.]

statutes against usury, of the state of New York, by declaring the whole to be a loan to the canal company, a corporation. It would be no injustice to the bank to hold the form given to the transaction in order to save the bank from a violation, or from an apparent violation, of the banking act, conclusive; and circumstances might, I think, be suggested, in which the bank would be estopped by it to aver that the transaction was other than it appeared on its face, and in the written instruments by which it was agreed that the loan should be made, and in the form of the notes actually given to the bank by Avery therefor. For the purposes of the case before me, I have concluded to treat the transaction in the aspect most favorable to the bank, and in accordance with the claim made in its behalf, as a loan to the canal company, a corporation of the state of Michigan.

The above-mentioned note for $73,902.51, was, on the 18th of September, 1871, renewed for the amount of $70,000, and a new note for the last-named sum, payable with interest thereon, was given, by the same corporation, under a new name, "Lake Superior Ship Canal Railroad and Iron Company," endorsed by the bankrupt, Wild, and others. The two notes, one dated September 18th, 1871, for $70,000 and interest, the other, dated February 13th, 1871, for $35,-111.49 and interest, constitute the claim made by the receiver of the bank against the estate of the bankrupt, Wild, who endorsed them; and it is the allowance of that claim by the district court which is appealed from by the assignee to this court.

The loan originally made by the bank was further secured by the delivery to the bank of coupon bonds of the canal company, secured by mortgage, to the amount of two hundred thousand dollars, and it was made a condition of the loan, that the canal company should purchase and receive from the bank certain bonds, amounting on their face to $237,000, of a Georgia railroad corporation, whose road had been stripped of its rails and furniture, whose track had grown up with trees and bushes, which had not been used for many years, on whose bonds no interest had been for a long time paid, and whose bonds had no market value; and their want of intrinsic value was more fully shown by a foreclosure soon after effected, on which the road, the mortgage security for the entire issue of bonds, $924,600, of which these were a part, was sold at public auction, to the highest bidder, for $1,500. It is true, that the purchaser of the road, who seems to have acted for the canal company, states, that, after obtaining an act of the legislature of Georgia, incorporating a new company, and an act authorizing the state to guarantee another large issue of bonds, to enable the new company to reconstruct the railroad, he received a like amount of stock in the new company, $237,000, and

succeeded in selling that for $47,000, which sum he paid to the canal company, as and for the proceeds of the purchase which they made from the bank, and of his exertions to obtain a new charter and the pledge of state aid, without which the stock would seem to be of little, if any, value.

Recurring to the transaction between the Ocean National Bank and the canal company, it was made a condition of the loan of the $150,000 by the bank to the canal company, that, besides paying interest at seven per cent. per annum, and securing the same by $200,000 of their mortgage bonds, with power to the bank, at any time, to sell such bonds at any price not less than 90 cents on the dollar, towards the repayment of the loan, (which might, therefore, not continue for more than a very brief term,) the canal company should, also, purchase from the bank the before-mentioned nearly worthless bonds of the Georgia Railroad Company, and should pay therefor the sum of $100,000, securing such payment by a like amount of their mortgage coupon bonds. There was, also, a further requirement, to wit, that the trustee to whom the mortgage securing the canal company's coupon bonds was executed, should be removed or should resign his trust, that the president of the bank should be substituted in his place, and that the moneys loaned by the bank should only be drawn by the canal company from the bank by checks countersigned by the president of the bank, as such trustee. Their president was active in the negotiations with the company, and in settling the terms of the loan; and he required of the canal company, professedly for his own benefit, $50,000 of mortgage coupon bonds, as compensation for acting as trustee. I shall place no special stress upon that payment to the president, as affecting the question of the liability of the bankrupt in this case. It, however, belongs to the history of the transaction.

The canal company having received the proceeds of the discounts of the various notes given for the loan, subsequently paid considerable sums, by paying the interest coupons attached to the bonds, held by the bank as collateral security, and other considerable sums derived otherwise; and it seems conceded, that the two notes endorsed by the bankrupt, Wild, and the subject of controversy here, constitute the residue of the claim of the bank arising out of the said loan, assuming its entire validity and their title to the same, with interest.

The assignee of Wild (the appellant here) insists, that the loan was usurious, and that there is, on that ground, no valid claim against Wild, as endorser; that, under the national banking act, the loan being made by the bank reserving a compensation exceeding seven per cent. interest per annum, all interest on the loan was forfeited, and the payments made by the canal company amount to satisfaction of the principal debt;

and that the notes, therefore, which are here presented bearing the endorsement of the bankrupt, are without consideration, and constitute no valid claim against his estate.

In the court below, the transaction was assumed to be such, that, had the loan been made to an individual instead of a corporation, it was a violation of the statutes of New York regulating the subject of interest, and the securities or notes given therefor would have been void for usury. In that view of the subject I most fully concur, and must find, as a fact, upon the evidence, that the conditions of the loan reserved to the bank, in money, more than seven per cent. per annum. No one unaffected by interest, bias or prejudice can, I think, read the testimony without being satisfied that the bank, in prescribing the terms of the loan, made it an occasion for extorting from the canal company most onerous conditions, greatly exceeding lawful interest, and that the form of a sale of Georgia railroad bonds, for a price far above their either real or market value, (if, indeed, they had any value, which is very doubtful,) was only a cover and means of securing in money the excessive and illegal compensation the bank reserved and secured for making this loan.

It was, however, held below, that, under the laws of the state of New York, which forbid a corporation to interpose the defence of usury, the transaction must be deemed, between the bank and the canal company, a legal transaction, the notes given by the canal company to the bank legal and binding notes, and, therefore, the endorsement thereof by the bankrupt, as surety for the canal company, a legal and binding endorsement; and, further, that the provisions of the national banking law relating to the interest which national banks may receive, and imposing penalties for charging more, do not affect the transaction, because they only apply to states which have no laws fixing the rate of interest.

It was not the intention of congress, when enacting the national banking law, to authorize national banks, in respect to exacting interest, to violate the laws of the states within which they might be organized, nor, as I think, to relieve them from the consequences of such violation, prescribed by the state laws, if they were guilty thereof. This is the result of the decision of the court of appeals of the state of New York, in First Nat. Bank of Whitehall v. Lamb, 50 N. Y. 95. Without adopting the reasoning of the opinion in that case, I deem the conclusion as above stated correct.

On the other hand, it was entirely competent for congress, when providing for the organization of national banks, to place them under such restrictions, in respect to the rate of interest which they might charge or receive, as congress might see fit. As creatures of their own creation, they could be subjected to such inhibitions as were deemed expedient, even though the privileges were far short of those enjoyed by state banks, or by individuals within the several states. This would involve no conflict with state laws, nor be an attempt to regulate private and domestic affairs within the states, beyond the powers of the federal government. It would be merely defining the powers and regulating the conduct of the organizations which existed only by force of federal enactment, possessed the powers congress chose to confer upon them, and exercised them subject to the restrictions and conditions of the law giving them existence. Indeed, the acceptance of the organization under the law, and the enjoyment of its privileges, are necessarily subordinate to the conditions upon which the powers and privileges are conferred. Hence, had congress seen fit to say that no national bank should contract for, reserve, or receive more than at the rate of five per cent. per annum for a loan of money, or for or upon the discounting of a note, bill, or other security, it would have been a perfectly valid limitation of their powers. It would be in no conflict with any law of a state which permitted the making of loans in general at a higher rate of interest; and, if congress could do this, congress could also declare the forfeiture or penalty incurred by the national bank for violating the prohibition. Such bank would still be left subject to the operation of the state law imposing, it might be, a different penalty for the violation of its own state laws, as was held by the New York court of appeals in the case above referred to. It follows, that transactions may not be condemned by the state laws, applied to individuals or to corporations in general, and may, under such state laws, be legal and valid, which, nevertheless, national banks may not make, and for which, if made, they may be liable to penalties or forfeitures prescribed by the law of their being. It may be, that, in reference to the conduct of merely private or domestic affairs within the states, having no connection with, or relation to, their functions as agents of the government, congress cannot authorize national banks to do what is forbidden by state laws, nor relieve them from the forfeitures or penalties prescribed by state laws for doing what is so forbidden. But this concession would be far short of admitting, that, within the range of what the state laws do permit, congress may not restrict national banks as is seen fit, or may not impose such penalties and forfeitures for a violation of those restrictions as congress thinks lawful. These latter propositions are unquestionable.

How, then, do the laws of the state of New York and the national banking law bear upon the case under consideration? The 30th section of the national banking act of June 3, 1864 (13 Stat. 108), provides, that "every association may take, receive, reserve, and charge, on any loan or discount made, or upon any note, bill of exchange, or other evi-

dence of debt, interest at the rate allowed by the laws of the state or territory where the bank is located, and no more, except that, where, by the laws of any state, a different rate is limited for banks of issue organized under state laws, the rate so limited shall be allowed for associations organized in any such state under this act. And, when no rate is fixed by the laws of the state or territory, the bank may take, receive, reserve, or charge a rate not exceeding seven per centum, and such interest may be taken in advance, reckoning the days for which the note, bill, or other evidence of debt has to run. And the knowingly taking, receiving, reserving, or charging a rate of interest greater than aforesaid, shall be held and adjudged a forfeiture of the entire interest, which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon. And, in case a greater rate of interest has been paid, the person or persons paying the same, or their legal representatives, may recover back, in any action of debt, twice the amount of the interest thus paid, from the association taking or receiving the same: provided, that such action is commenced within two years from the time the usurious transaction occurred."

The state of New York has statutes which prohibit the taking, receiving, or reserving of interest for the loan or forbearance of money, &c., at a greater rate than seven per cent. per annum, and making any note, or bill, or other contract whereon or whereby any greater rate is reserved, void. But the state has a further statute (Laws 1850, c. 172, p. 334), which enacts that no corporation shall interpose the defence of usury in any action. Such was the state of the law in New York when the national banking act was passed. The force and effect of this last-named statute has been declared by the courts of the state of New York in numerous cases. Those cases are collected, carried to what is deemed their legitimate conclusion, by the court of appeals, and distinctly affirmed, in Rosa v. Butterfield, 33 N. Y. 665. The doctrine of that case is, that the dealings of a corporation, as a borrower, and its contracts or obligations for loans, are unaffected by any laws of the state of New York regulating interest; that, as to them, such laws, theretofore existing, are repealed; that, therefore, the rate of interest which corporations may agree to pay is not fixed or limited, but they may agree to pay any rate they see fit, and their contract will be valid; and, also, that one who becomes surety, guarantor, or indorser of such a contract is legally bound to its performance—in short, that, as to contracts made by corporations, whether foreign or domestic, whether made in the state of New York or elsewhere, they stand, in the state of New York, as if no usury laws existed. See, also, Belmont Branch Bank v. Hoge, 35 N. Y. 65. In respect to contracts made within the state of New York,

or entered into under or with reference to the laws of the state, I may accept the exposition thus given of the state of the law of New York; and it follows, that there is no law in New York fixing the rate of interest which any one may take upon the loan of money to a corporation, or, in other words, any rate of interest is allowed to which the parties may agree. As to dealings with corporations, national banks in the state of New York are, therefore, within the case described in the national banking law above cited, to wit, "when no rate is fixed by the laws of the state or territory, the bank may take, receive, reserve, or charge a rate not exceeding seven per centum," &c. This is a necessary and logical result. If the rate were fixed by the laws of New York, then her usury laws would apply. If the limitations in her statutes relating to interest do not apply, then no rate is fixed by her laws. Hereupon the restriction, contained in the section of the national banking law, comes into effect, without any interference or conflict with state laws, that is to say, a national bank "may take, receive, or charge a rate not exceeding seven per centum, and such interest may be taken in advance," &c., "and the knowingly taking, reserving, or charging a rate of interest greater than aforesaid, shall be held and adjudged a forfeiture of the entire interest which the note, bill, or other evidence of debt carries with it, or which has been agreed to be paid thereon; and, in case a greater rate of interest has been paid, the person or persons paying the same, or their legal representatives, may recover back, in any action of debt, twice the amount of the interest thus paid, from the association taking or receiving the same: provided that such action is commenced within two years from the time the usurious transaction occurred." It is not necessary that I should express an opinion upon the question whether this forfeiture and right to recover back can, in any circumstances, be applicable to the case mentioned in the previous clause of the section, to wit, where the national bank reserves or receives a greater rate of interest than is allowed by the laws of a state in which a rate is fixed and limited by the state laws. It is sufficient for the purposes of the present case that it does apply to a case in which no rate is thus fixed and limited. By the laws of the state of New York, as expounded by her highest court, no rate of interest upon loans to a corporation is fixed or limited.

It follows, that the transaction in question was within the prohibition of the national banking law, and that the bank, eo instanti it made the loan, upon the terms exacted, incurred the forfeiture of the entire interest which the notes received, carried with them, or which was agreed to be paid thereon. Discounting the notes did not render it less true, that the notes themselves carried with them the principal loaned, and the interest

agreed to be paid, which, with the bonds also given, necessarily included all the pecuniary benefit agreed to be paid as compensation for the loan, whatever form the transaction was made colorably to assume.

The bankrupt, as mere accommodation endorser or surety, is, upon familiar principles of equity, entitled to all the protection which his principal (the canal company) would have if the notes in question were sought to be enforced against it. I do not say that he can recover back money paid by the canal company, but he has a right to enquire whether, in view of the forfeiture of the entire interest by the bank, there is anything due to the bank upon the notes which he endorsed, and thereby to ascertain whether, and to what extent, the two notes now in question are without consideration.

It is claimed, by the assignee of the bankrupt, that, treating the entire interest as forfeited, the bank have already been paid the whole of the principal of the loan. I am not fully satisfied that a small sum, part of such principal, is not still due. Upon the proofs taken, the account would seem to stand thus:

|  | Dr. |  |  |
|---|---|---|---|
| Loan | | $150,000 00 | |
| Less the interest or discount included in the notes given therefor from time to time | | 27,117 26 | $122,882 74 |

|  | Cr. |  |  |
|---|---|---|---|
| Cash payment by Canal Co. | $88,750 00 | | |
| Coupons paid     "     " | 58,476 67 | | |
| Note paid | 12,798 90 | | |
| Cash paid on giving the note for $73,902 51, which, according to the testimony, made up the whole amount, $76,532 19 | 2,629 68 | | |
| Cash paid on renewal of the note for $73 902 51, when the $70,000 note, now in question, was given | 3,902 51 | | |
| | | $166,557 76 | |
| From which are to be deducted sundry charges to which these payments appear to have been in part applied, viz.: | | | |
| Another note for $25,000, and interest | $25,452 80 | | |
| Another note for $12,500, and interest | 12,726 40 | | |
| Interest on these notes after maturity | 678 00 | | |
| Coupons paid by the bank for the company | 8,068 12 | | |
| Interest thereon | 113 25 | $47 038 57 | $119,519 19 |
| Leaving a balance of principal due when the notes in question were endorsed by the bankrupt | | | $3,363 55 |

To this extent, of $3,363 55, without interest, it would seem the claim of the receiver should be allowed, but the estate of the bankrupt is entitled to have the collateral security held by the receiver of the bank, or the proceeds thereof, applied to this balance, in exoneration of the estate of the bankrupt, on a sale of a portion of which, by order of the district court, it appears, by the order appealed from, $23,663 30 has been already realized.

I by no means make this statement of the account as a final and conclusive statement. The proofs on the part of the bank do not appear to have been put in with a view to the statement of an account upon the principles

affirmed in this opinion. The value of the collateral security held by the receiver, or the proceeds of that portion thereof which appears to have been deposited in the trust company, under the order of the district court, ($23.663 30,) may be. and probably are, so clearly greater than any balance which a more accurate statement of the account would show to be due, upon the principles of this opinion, that any further expense of taking proofs and stating the account would be improvident and wasteful. But, if insisted upon, a reference may be had to state such account.

The order appealed from must be modified to conform to the foregoing opinion.