# MARQUETTE NATIONAL BANK OF MINNEAPOLIS v. FIRST OF OMAHA SERVICE CORP. ET AL.

No. 77–1265.   Argued October 31, 1978—Decided December 18, 1978*

---

*Together with No. 77–1258, *Minnesota* v. *First of Omaha Service Corp. et al.,* also on certiorari to the same court.

BRENNAN, J., delivered the opinion for a unanimous Court.

*Richard B. Allyn,* Solicitor General of Minnesota, argued the cause for petitioner in No. 77–1258. With him on the briefs were *Warren Spannaus,* Attorney General, *Stephen Shakman, Jacqueline P. Taylor,* and *Barry R. Greller,* Special Assistant Attorneys General, and *Thomas R. Muck,* Assistant Attorney General. *John Troyer* argued the cause for petitioner in No. 77–1265. With him on the briefs was *J. Patrick McDavitt.*

*Robert H. Bork* argued the cause for respondent First of Omaha Service Corp. in both cases. On the brief was *Clay R. Moore.*†

---

†Briefs of *amici curiae* urging reversal were filed by *Richard C. Turner,* Attorney General, and *Julian B. Garrett,* Assistant Attorney General, for the State of Iowa; and by *Roger A. Peterson* for the Minnesota AFL–CIO.

*Peter D. Schellie* filed a brief for the Consumer Bankers Assn. as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed by *James F. Bell* and *Calvin Davison* for the Conference of State Bank Supervisors; and by *Joseph DuCoeur* and *Alan I. Becker* for the First National Bank of Chicago.

MR. JUSTICE BRENNAN delivered the opinion of the Court.

The question for decision is whether the National Bank Act, Rev. Stat. § 5197, as amended, 12 U. S. C. § 85,[1] authorizes a national bank based in one State to charge its out-of-state credit-card customers an interest rate on unpaid balances allowed by its home State, when that rate is greater than that permitted by the State of the bank's nonresident customers. The Minnesota Supreme Court held that the bank is allowed by § 85 to charge the higher rate.  262 N. W. 2d 358 (1977). We affirm.

I

The First National Bank of Omaha (Omaha Bank) is a national banking association with its charter address in Omaha, Neb.[2]  Omaha Bank is a card-issuing member in the BankAmericard plan.  This plan enables cardholders to purchase goods and services from participating merchants and to

---

[1] Section 85 states in pertinent part:

"Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, or in the case of business or agricultural loans in the amount of $25,000 or more, at a rate of 5 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the bank is located, whichever may be the greater, and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter."  See §§ 201, 206 of Pub. L. 93–501, 88 Stat. 1558, 1560.

[2] The National Bank Act, Rev. Stat. § 5134, 12 U. S. C. § 22, provides that a national bank must create an "organization certificate" which specifically states "[t]he place where its operations of discount and deposit are to be carried on, designating the State, Territory, or District, and the particular county and city, town, or village."

obtain cash advances from participating banks throughout the United States and the world. Omaha Bank has systematically sought to enroll in its BankAmericard program the residents, merchants, and banks of the nearby State of Minnesota. The solicitation of Minnesota merchants and banks is carried on by respondent First of Omaha Service Corp. (Omaha Service Corp.), a wholly owned subsidiary of Omaha Bank.

Minnesota residents are obligated to pay Omaha Bank interest on the outstanding balances of their BankAmericards. Nebraska law permits Omaha Bank to charge interest on the unpaid balances of cardholder accounts at a rate of 18% per year on the first $999.99, and 12% per year on amounts of $1,000 and over.[3] Minnesota law, however, fixes the permissible annual interest on such accounts at 12%.[4] To compen-

---

[3] See Neb. Rev. Stat. §§ 8–815 to 8–823, 8–825 to 8–829 (1974). Omaha Bank assesses a finance charge on the daily outstanding balance of cash advances and on the entire previous balance of purchases of goods or services before deducting any payments made during the billing cycle. No finance charges are imposed, however, on the purchases portion of the account balance when the previous month's total balance is paid in full on or before the due date shown on the monthly statement. See Stipulation of Facts, App. 93a–94a.

[4] Minnesota Stat. § 48.185 (1978) provides in pertinent part:

"Subdivision 1. Any bank organized under the laws of this state, any national banking association doing business in this state, and any savings bank organized and operated pursuant to Chapter 50, may extend credit through an open end loan account arrangement with a debtor, pursuant to which the debtor may obtain loans from time to time by cash advances, purchase or satisfaction of the obligations of the debtor incurred pursuant to a credit card plan, or otherwise under a credit card or overdraft checking plan.

.          .          .          .          .

"Subd. 3. A bank or savings bank may collect a periodic rate of finance charge in connection with extensions of credit pursuant to this section, which rate does not exceed one percent per month computed on an amount no greater than the average daily balance of the account during each monthly billing cycle. If the billing cycle is other than monthly, the

sate for the reduced interest, Minnesota law permits banks to charge annual fees of up to $15 for the privilege of using a bank credit card.[5]

maximum finance charge for that billing cycle shall be that percentage which bears the same relation to one percent as the number of days in the billing cycle bears to 30.

"Subd. 4. No charges other than those provided for in subdivision 3 shall be made directly or indirectly for any credit extended under the authority of this section, except that there may be charged to the debtor:

"(a) Annual charges, not to exceed $15 per annum, payable in advance, for the privilege of using a bank credit card which entitled the debtor to purchase goods or services from merchants, under an arrangement pursuant to which the debts resulting from the purchases are paid or satisfied by the bank or savings bank and charged to the debtor's open end loan account with the bank or savings bank . . . .

"Subd. 5. If the balance in a revolving loan account under a credit card plan is attributable solely to purchases of goods or services charged to the account during one billing cycle, and the account is paid in full before the due date of the first statement issued after the end of that billing cycle, no finance charge shall be charged on that balance.

"Subd. 6. This section shall apply to all open end credit transactions of a bank or savings bank in extending credit under an open end loan account or other open end credit arrangement to persons who are residents of this state, if the bank or savings bank induces such persons to enter into such arrangements by a continuous and systematic solicitation either personally or by an agent or by mail, and retail merchants and banks or savings banks within this state are contractually bound to honor credit cards issued by the bank or savings bank, and the goods, services and loans are delivered or furnished in this state and payment is made from this state. A term of a writing or credit card device executed or signed by a person to evidence an open end credit arrangement specifying:

"(a) that the law of another state shall apply;

"(b) that the person consents to the jurisdiction of another state; and

"(c) which fixes venue;

"is invalid with respect to open end credit transactions to which this section applies. An open end credit arrangement made in another state with a person who was a resident of that state when the open end credit arrangement was made is valid and enforceable in this state according to

The instant case began when petitioner Marquette National Bank of Minneapolis (Marquette),[6] itself a national banking association enrolled in the BankAmericard plan,[7] brought suit in the District Court of Hennepin County, Minn., to enjoin Omaha Bank and Omaha Service Corp. from soliciting in Minnesota for Omaha Bank's BankAmericard program until such time as that program complied with Minnesota law.[8] Marquette claimed to be losing customers to Omaha Bank because, unlike the Nebraska bank, Marquette was forced by the low rate of interest permissible under Minnesota law to charge a $10 annual fee for the use of its credit cards. App. 7a–15a, 45a–48a.

Marquette named as defendants Omaha Bank, Omaha Service Corp., which is organized under the laws of Nebraska but qualified to do business and doing business in Minnesota,[9] and the Credit Bureau of St. Paul, Inc., a corporation organized under the laws of Minnesota having its principal office

its terms to the extent that it is valid and enforceable under the laws of the state applicable to the transaction.

"Subd. 7. Any bank or savings bank extending credit in compliance with the provisions of this section, which is injured competitively by violations of this section by another bank or savings bank, may institute a civil action in the district court of this state against that bank or savings bank for an injunction prohibiting any violation of this section. The court, upon proper proof that the defendant has engaged in any practice in violation of this section, may enjoin the future commission of that practice. Proof of monetary damage or loss of profits shall not be required. . . . The relief provided in this subdivision is in addition to remedies otherwise available against the same conduct under the common law or statutes of this state."

[5] See Minn. Stat. § 48.185 (4) (a) (1978), supra, n. 4.

[6] Marquette is petitioner in No. 77–1265.

[7] The principal banking offices of Marquette are located in the County of Hennepin in the State of Minnesota. See n. 2, supra.

[8] Marquette also asked for compensatory and punitive damages. App. 16a.

[9] The principal offices of Omaha Service Corp. are located in Omaha, Neb.

in St. Paul, Minn. Omaha Service Corp. participates in Omaha Bank's BankAmericard program by entering into agreements with banks and merchants necessary to the operation of the BankAmericard scheme. *Id.*, at 30a. At the time Marquette filed its complaint, Omaha Service Corp. had not yet entered into any such agreements in Minnesota, although it intended to do so. *Id.*, at 30a, 92a, 94a. For its services, Omaha Service Corp. receives a fee from Omaha Bank, but it does not itself extend credit or receive interest.[10] *Id.*, at 94a, 97a–110a. It was alleged that the Credit Bureau of St. Paul, Inc., solicited prospective cardholders for Omaha Bank's BankAmericard program in Minnesota. *Id.*, at 9a, 30a.

The defendants sought to remove Marquette's action to Federal District Court. See 12 U. S. C. § 94.[11] Marquette responded by dismissing without prejudice its action against Omaha Bank, see Fed. Rule Civ. Proc. 41 (a)(1)(i), and the District Court, citing *Gully* v. *First Nat. Bank,* 299 U. S. 109 (1936), remanded the case to the District Court of Hennepin County. *Marquette Nat. Bank* v. *First Nat. Bank of Omaha,* 422 F. Supp. 1346 (Minn. 1976). Marquette thereupon moved for partial summary judgment to have Omaha Bank's BankAmericard program declared in violation of the Minnesota usury statute, Minn. Stat. § 48.185 (1978),[12] and permanently to enjoin the remaining defendants from engaging in

---

[10] Omaha Service Corp. does, however, accept assignments of delinquent accounts from Omaha Bank and, as an incident to collecting these accounts, does collect interest. *Id.*, at 94a.

[11] The venue provision of the National Bank Act, Rev. Stat. § 5198, 12 U. S. C. § 94, states:

"Suits, actions and proceedings against any association under this chapter may be had in any district or Territorial court of the United States held within the district in which such association may be established, or in any State, county, or municipal court in the county or city in which said association is located having jurisdiction in similar cases."

[12] See n. 4, *supra.*

any activity in connection with the offering or operation of that program in further violation of Minnesota law. Defendants argued that the National Bank Act, Rev. Stat. § 5197, as amended, 12 U. S. C. § 85,[13] pre-empted Minn. Stat. § 48.185 and enforcement of that statute against Omaha Bank's Bank-Americard program. Upon being notified of this challenge to Minn. Stat. § 48.185, the Attorney General of the State of Minnesota[14] intervened as a party plaintiff and joined in Marquette's prayer for a declaratory judgment and permanent injunction.

The District Court of Hennepin County granted plaintiffs' motion for partial summary judgment, holding in an unreported opinion that "nothing contained in the National Bank Act, 12 U. S. C. § 85, precludes or preempts the application and enforcement of Minnesota Statutes, § 48.185 to the First National Bank of Omaha's BankAmericard program as solicited and operated in the State of Minnesota." App. 139a–140a. The court enjoined Omaha Service Corp., "as agent of the First National Bank of Omaha," from "engaging in any solicitation of residents of the State of Minnesota or other activity in connection with the offering or operation of a bank credit card program in the State of Minnesota in violation of Minnesota Statutes, § 48.185." [15]   Id., at 140a–141a.

On appeal, the Minnesota Supreme Court reversed. Noting that Marquette's dismissal of Omaha Bank was a procedural device that removed the case from the jurisdiction of the federal courts of the Eighth Circuit, and noting that a recent decision of the Court of Appeals for the Eighth Circuit had made it plain that in its judgment the usury laws of Nebraska rather than Minnesota should govern the operation of Omaha Bank's BankAmericard program in Minnesota, see *Fisher* v.

---

[13] See n. 1, *supra*.

[14] The State of Minnesota is petitioner in No. 77–1258.

[15] Defendant Credit Bureau of St. Paul, Inc., was not named as an addressee of the injunction, and it is not before this Court.

*First Nat. Bank of Omaha,* 548 F. 2d 255 (1977),[16] the Minnesota Supreme Court concluded that it would be "inappropriate for this court to permit the use of procedural devices to obtain a result inconsistent with the existing doctrine in the Eighth Circuit." 262 N. W. 2d, at 365.[17] Plaintiffs filed timely petitions for writs of certiorari,[18] which we granted, 436 U. S. 916 (1978), in order to decide the appropriate application of 12 U. S. C. § 85.

## II

In the present posture of this case Omaha Bank is no longer a party defendant. The federal question presented for decision is nevertheless the application of 12 U. S. C. § 85 to the operation of Omaha Bank's BankAmericard program. There is no allegation in petitioners' complaints that either Omaha Service Corp. or the Minnesota merchants and banks participating in the BankAmericard program are themselves

---

[16] In its opinion the Eighth Circuit relied upon the decision of the Court of Appeals for the Seventh Circuit in *Fisher* v. *First Nat. Bank of Chicago,* 538 F. 2d 1284 (1976).

[17] The Supreme Court of Iowa has since reached a contrary conclusion. See *Iowa ex rel. Turner* v. *First of Omaha Service Corp.,* 269 N. W. 2d 409 (1978), appeal docketed, No. 78-846.

[18] We reject respondent's argument that the petitions are untimely. The opinion of the Minnesota Supreme Court was filed on November 10, 1977. Petitioners filed a timely petition for rehearing, which, under Minnesota law, defers the entry of judgment until after the disposition of the petition. See Minn. Rules Civ. App. Proc. 136.02, 140. The petition for rehearing was denied on December 8, 1977; judgment was entered on December 14, 1977, by way of a separate document stating that "the order and judgment of the Court below, herein appealed from, . . . be and the same hereby is in all things reversed." App. H to Pet. for Cert. in No. 77-1265. Petitions for certiorari were filed in this Court on March 13, 1978, within the 90 days "after the entry of such judgment or decree" allotted by 28 U. S. C. § 2101 (c). See *Puget Sound Power & Light Co.* v. *King County,* 264 U. S. 22, 24-25 (1924); *Commissioner* v. *Estate of Bedford,* 325 U. S. 283, 284-288 (1945).

extending credit in violation of Minn. Stat. § 48.185 (1978), and we therefore have no occasion to determine the application of the National Bank Act in such a case.

Omaha Bank is a national bank; it is an "instrumentalit[y] of the Federal government, created for a public purpose, and as such necessarily subject to the paramount authority of the United States." *Davis* v. *Elmira Savings Bank,* 161 U. S. 275, 283 (1896). The interest rate that Omaha Bank may charge in its BankAmericard program is thus governed by federal law. See *Farmers' & Mechanics' Nat. Bank* v. *Dearing,* 91 U. S. 29, 34 (1875). The provision of § 85 called into question states:

> "Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidences of debt, interest at the rate allowed by the laws of the State, Territory, or District *where the bank is located,* . . . and no more, except that where by the laws of any State a different rate is limited for banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under this chapter." (Emphasis supplied.)

Section 85 thus plainly provides that a national bank may charge interest "on any loan" at the rate allowed by the laws of the State in which the bank is "located." The question before us is therefore narrowed to whether Omaha Bank and its BankAmericard program are "located" in Nebraska and for that reason entitled to charge its Minnesota customers the rate of interest authorized by Nebraska law.[19]

---

[19] We have no occasion in this case to parse the meaning of the phrase in § 85 "associations *organized or existing* in any such State . . . ." (Emphasis added.) This phrase occurs in the "except" clause of § 85, which, at least since *Tiffany* v. *National Bank of Missouri,* 18 Wall. 409 (1874), has been interpreted as an "enabling" clause. "If there is a rate of interest fixed by State laws for lenders generally, the banks are allowed to charge

There is no question but that Omaha Bank itself, apart from its BankAmericard program, is located in Nebraska. Petitioners concede as much. See Brief for Petitioner in No. 77–1258, p. 3; Brief for Petitioner in No. 77–1265, pp. 3, 16, 33–34. The National Bank Act requires a national bank to state in its organization certificate "[t]he place where its operations of discount and deposit are to be carried on, designating the State, Territory, or district, and the particular county and city, town, or village." Rev. Stat. § 5134, 12 U. S. C. § 22. The charter address of Omaha Bank is in Omaha, Douglas County, Neb. The bank operates no branch banks in Minnesota, cf. *Seattle Trust & Savings Bank* v. *Bank of California,* 492 F. 2d 48 (CA9 1974), nor apparently could it under federal law.[20] See 12 U. S. C. § 36 (c).[21]

The State of Minnesota, however, contends that this con-

---

that rate, but no more, except that if State banks of issue are allowed to reserve more, the same privilege is allowed to National banking associations." *Id.,* at 411. Since there is in this case no allegation or proof that Minnesota state banks are "allowed to reserve more" than the rate of interest "for lenders generally," we need not determine the relationship of the phrase "organized or existing" to the term "located."

[20] There is no contention that Omaha Bank could qualify to operate a branch bank in Minnesota under the grandfather provisions of 12 U. S. C. § 36 (a).

Although Nebraska law prohibits branch banking, it permits the establishment of not more than two "detached auxiliary teller offices" which must be maintained "within the corporate limits of the city in which such bank is located." Neb. Rev. Stat. §§ 8–157 (1) and (2) (1977). Nebraska also permits banks to operate manned or unmanned "electronic satellite facilities." § 8–157 (3). There is no contention in this case that Omaha Bank operates such facilities in the State of Minnesota.

[21] Last Term *Citizens & Southern Nat. Bank* v. *Bougas,* 434 U. S. 35 (1977), held that, with respect to the venue provision of the National Bank Act, 12 U. S. C. § 94, *supra,* n. 11, a national bank is "located" either in the place designated in its "organization certificate," 12 U. S. C. § 22, *supra,* n. 2, or in the places in which it has established authorized branches. Omaha Bank is thus also "located" in Nebraska for purposes of 12 U. S. C. § 94.

clusion must be altered if Omaha Bank's BankAmericard program is considered: "In the context of a national bank which systematically solicits Minnesota residents for credit cards to be used in transactions with Minnesota merchants the bank must be deemed to be 'located' in Minnesota for purposes of this credit card program." Reply Brief for Petitioner in No. 77–1258, p. 7.

We disagree. Section 85 was originally enacted as § 30 of the National Bank Act of 1864,[22] 13 Stat. 108.[23] The congressional debates surrounding the enactment of § 30 were conducted on the assumption that a national bank was "located" for purposes of the section in the State named in its organization certificate. See Cong. Globe, 38th Cong., 1st Sess., 2123–2127 (1864). Omaha Bank cannot be deprived of this location merely because it is extending credit to residents of a foreign State. Minnesota residents were always free to visit Nebraska and receive loans in that State. It has

---

[22] Although the Act of June 3, 1864, ch. 106, 13 Stat. 99, was originally entitled "An Act to Provide a National Currency . . . ," its title was altered by Congress in 1874 to "the national-bank act." Ch. 343, 18 Stat. 123.

[23] Section 30 was, in its pertinent parts, virtually identical with the current § 85. Section 30 stated:

"[E]very association may take, reserve, receive, and charge on any loan, or discount made, or upon any note, bill of exchange, or other evidences of debt, interest at the rate allowed by the laws of the state or territory where the bank is located, and no more, except that where by the laws of any state a different rate is limited for banks of issue organized under state laws, the rate so limited shall be allowed for associations organized in any such state under this act."

Section 30 was preceded by § 46 of the National Currency Act of 1863, 12 Stat. 678, which provided:

"[E]very association may take, reserve, receive, and charge on any loan, or discount made, or upon any note, bill of exchange, or other evidence of debt, such rate of interest or discount as is for the time the established rate of interest for delay in the payment of money, in the absence of contract between the parties, by the laws of the several States in which the associations are respectively located, and no more . . . ."

not been suggested that Minnesota usury laws would apply to such transactions. Although the convenience of modern mail permits Minnesota residents holding Omaha Bank's BankAmericards to receive loans without visiting Nebraska, credit on the use of their cards is nevertheless similarly extended by Omaha Bank in Nebraska by the bank's honoring of the sales drafts of participating Minnesota merchants and banks.[24] Finance charges on the unpaid balances of cardhold-

[24] Once again, there is no allegation in these cases that either Omaha Service Corp. or any of the Minnesota merchants or banks participating in Omaha Bank's BankAmericard program are themselves extending credit in violation of Minn. Stat. § 48.185 (1978).

In their stipulation of facts, the parties describe the operation of the BankAmericard program as follows:

"III

.        .        .        .        .

"While participating Minnesota banks will not have the authority to issue cards or extend credit directly in connection with BankAmericard transactions, they will advertise the BankAmericard plan and solicit applications for BankAmericards from Minnesota residents which are then forwarded to First National Bank of Omaha for acceptance or rejection, and they will serve as a depository for BankAmericard sales drafts deposited by participating merchants with whom defendant First of Omaha Service Corporation has member agreements.

.        .        .        .        .

"V

"Minnesota cardholders wishing to purchase goods and services or obtain cash advances with a BankAmericard issued by the First National Bank of Omaha, sign a BankAmericard form evidencing the transaction which is authenticated by the cardholder's BankAmericard credit card, and exchange the signed form for goods or services or cash from a participating Minnesota merchant or bank, respectively. The sales draft forms are then deposited by the participating Minnesota merchant in his account with a participating Minnesota bank for credit, which will then forward them and cash advance drafts drawn on such bank to the First National Bank of Omaha for credit.

"VI

"The First National Bank of Omaha renders periodic statements to its Minnesota cardholders and charges finance charges on the unpaid balance

ers are assessed by the bank in Omaha, Neb., and all payments on unpaid balances are remitted to the bank in Omaha, Neb. Furthermore, the bank issues its BankAmericards in Omaha, Neb., after credit assessments made by the bank in that city. App. 30a.

Nor can the fact that Omaha Bank's BankAmericards are used "in transactions with Minnesota merchants" be determinative of the bank's location for purposes of § 85. The bank's BankAmericard enables its holder "to purchase goods and services from participating merchants and obtain cash advances from participating banks throughout the United States and the world." Stipulation of Facts, App. 91a. Minnesota residents can thus use their Omaha Bank Bank-Americards to purchase services in the State of New York or mail-order goods from the State of Michigan. If the location of the bank were to depend on the whereabouts of each credit-card transaction, the meaning of the term "located" would be so stretched as to throw into confusion the complex system of modern interstate banking. A national bank could never be certain whether its contacts with residents of foreign States were sufficient to alter its location for purposes of § 85. We do not choose to invite these difficulties by rendering so elastic the term "located." The mere fact that Omaha Bank has enrolled Minnesota residents, merchants, and banks in its

of the cardholder's account. . . . Payments of account balances are remitted by Minnesota residents directly to the First National Bank of Omaha.

"VII

"The defendant First of Omaha Service Corporation and participating Minnesota banks are or will be paid a fee for their services rendered to the First National Bank of Omaha. Defendant First of Omaha Service Corporation and the participating Minnesota banks do not directly receive interest. However, the First of Omaha Service Corporation does accept assignments of delinquent accounts from the First National Bank of Omaha, and as an incident to collecting these accounts, does collect interest." App. 92a–94a.

BankAmericard program thus does not suffice to "locate" that bank in Minnesota for purposes of 12 U. S. C. § 85.[25]   See *Second Nat. Bank of Leavenworth* v. *Smoot,* 9 D. C. 371, 373 (1876).

## III

Since Omaha Bank and its BankAmericard program are "located" in Nebraska, the plain language of § 85 provides that the bank may charge "on any loan" the rate "allowed" by the State of Nebraska.   Petitioners contend, however, that this reading of the statute violates the basic legislative intent of the National Bank Act.   See *Train* v. *Colorado Public Interest Research Group,* 426 U. S. 1, 9–10 (1976).   At the time Congress enacted § 30 of the National Bank Act of 1864, 13 Stat. 108, so petitioners' argument runs, it intended "to insure competitive equality between state and national banks in the charging of interest."   Brief for Petitioner in No. 77–1265, p. 24.   This policy could best be effectuated by limiting national banks to the rate of interest allowed by the States in which the banks were located.   Since Congress in 1864 was addressing a financial system in which incorporated banks were "local institutions," it did not "contemplate a national bank soliciting customers and entering loan agreements outside of the state in which it was established."   Brief for Petitioner in No. 77–1258, p. 17.   Therefore to interpret § 85 to apply to interstate loans such as those involved in this case would not only enlarge impermissibly the original intent of Congress, but would also undercut the basic policy

---

[25] Similarly, the mere fact that a national bank "transacts business" or even violates the Securities Exchange Act of 1934 in a State other than that of its "organization certificate," see n. 2, *supra,* does not suffice to locate the bank in the foreign State for purposes of venue under the National Bank Act, 12 U. S. C. § 94, *supra,* n. 11.   *Radzanower* v. *Touche Ross & Co.,* 426 U. S. 148 (1976).   See *Bank of America* v. *Whitney Central Nat. Bank,* 261 U. S. 171 (1923); cf. *Cope* v. *Anderson,* 331 U. S. 461, 467 (1947).

foundations of the statute by upsetting the competitive equality now existing between state and national banks.

We cannot accept petitioners' argument. Whatever policy of "competitive equality" has been discerned in other sections of the National Bank Act, see, *e. g., First Nat. Bank* v. *Dickinson,* 396 U. S. 122, 131 (1969); *First Nat. Bank of Logan* v. *Walker Bank & Trust Co.,* 385 U. S. 252, 261–262 (1966), § 30 and its descendants have been interpreted for over a century to give "advantages to National banks over their State competitors." *Tiffany* v. *National Bank of Missouri,* 18 Wall. 409, 413 (1874). "National banks," it was said in *Tiffany,* "have been National favorites." [26]  The policy of competitive equality between state and national banks, however, is not truly at the core of this case.  Instead, we are confronted by the inequalities that occur when a national bank applies the interest rates of its home State in its dealing with residents of a foreign State.  These inequalities affect both national and state banks in the foreign State.  Indeed, in the instant case Marquette is a national bank claiming to be injured by the unequal interest rates charged by another national bank.[27]  Whether the inequalities which thus occur when the interest rates of one State are "exported" into another violate the intent of Congress in enacting § 30 in part depends on whether Congress in 1864 was aware of the existence of a system of interstate banking in which such inequalities would seem a necessary part.

Close examination of the National Bank Act of 1864, its legislative history, and its historical context makes clear that, contrary to the suggestion of petitioners, Congress intended

---

[26] The "most favored lender" status for national banks under *Tiffany* has since been incorporated into the regulations of the Comptroller of the Currency.  See 12 CFR § 7.7310 (a) (1978).

[27] We accept for purposes of argument Marquette's premise that it is injured competitively because Omaha Bank can charge higher prices for the use of its money.

to facilitate what Representative Hooper [28] termed a "national banking system." Cong. Globe, 38th Cong., 1st Sess., 1451 (1864). See also Report of the Comptroller of the Currency 4 (1864). Section 31 of the Act, for example, fully recognized the interstate nature of American banking by providing that three-fifths of the 15% of the aggregate amount of their notes in circulation that national banks were required to "have on hand, in lawful money" could

> "consist of balances due to an association available for the redemption of its circulating notes from associations approved by the comptroller of the currency, organized under this act, in the cities of Saint Louis, Louisville, Chicago, Detroit, Milwaukie [sic], New Orleans, Cincinnati, Cleveland, Pittsburg, Baltimore, Philadelphia, Boston, New York, Albany, Leavenworth, San Francisco, and Washington City." 13 Stat. 108, 109. [29]

[28] Representative Hooper reported the bill that was to become the National Bank Act of 1864 to the House from the Ways and Means Committee. See Million, The Debate on the National Bank Act of 1863, 2 J. Pol. Econ. 251, 279 (1894).

[29] Section 31 also provided:

"[T]he cities of Charleston and Richmond may be added to the list of cities in the national associations of which other associations may keep three fifths of their lawful money, whenever, in the opinion of the comptroller of the currency, the condition of the southern states will warrant it." 13 Stat. 109.

See also § 32 of the National Bank Act of 1864, 13 Stat. 109.

Senator Sherman, sponsor of the Act in the Senate, described in the following terms the purpose of § 31:

"The first important provision of this bill is, that it provides centers of redemption. Under the old bill, a bank was not bound to redeem its issues except at its own counter. If it failed to redeem there, then provision was made for winding it up. Under the present bill, certain cities of the United States are designated where the banks are required to redeem their issues. Each bank is to redeem its issue at its center of redemption as prescribed by the Comptroller of the Currency. The cities named are the principal cities along the Atlantic coast, Cincinnati, Louis-

The debates surrounding the enactment of this section portray a banking system of great regional interdependence. Senator Chandler of Michigan, for example, noted:

> "[T]he banking business of the Northwest is done upon bills of exchange. The wool clip of Michigan, the wheat crop of Michigan, the hog crop of Iowa, are all purchased with drafts drawn chiefly upon [New York, Philadelphia, and Boston]. The wool clip is chiefly bought by drafts upon Boston. I put in the three cities because it is convenient to the customer, to the broker, to the merchant, to be enabled to purchase a draft upon either one of these three places." Cong. Globe, 38th Cong., 1st Sess., 2144 (1864).[30]

See also id., at 1343, 1376, 2143–2145, 2152, 2181–2182. Similarly, the debates surrounding the enactment of § 41 of the Act, which provided that the shares of a national bank could be taxed as personal property "in the assessment of taxes imposed by or under state authority at the place where such bank is located, and not elsewhere," 13 Stat. 112, demon-

---

ville, Chicago, Detroit, and two or three other places. That will strengthen the system very much by relieving the noteholder from the trouble of going from any part of the United States to a remote village or city, and there demanding redemption at the counter of the bank." Cong. Globe, 38th Cong., 1st Sess., 1865 (1864).

[30] Senator Chandler was proposing an amendment to the provision of § 31 which required every national bank located in the enumerated cities to "have on hand, in lawful money of the United States, an amount equal to at least twenty-five per centum of the aggregate amount of its notes in circulation and its deposits." 13 Stat. 108. The amendment read:

"And one half of said twenty-five per cent. in banks organized under this act in the cities of St. Louis, Louisville, Chicago, Detroit, Milwaukee, Cincinnati, Cleveland, Pittsburg, and Portland may consist of balances due to the association available for the redemption of its circulating notes, from an association in the cities of New York, Boston, or Philadelphia." Cong. Globe, 38th Cong., 1st Sess., 2143 (1864).

strated a sensitive awareness of the possibilities of interstate ownership and control of national banks. See, *e. g.,* Cong. Globe, 38th Cong., 1st Sess., 1271, 1898–1899 (1864).

Although in the debates surrounding the enactment of § 30 there is no specific discussion of the impact of interstate loans, these debates occurred in the context of a developed interstate loan market. As early as 1839 this Court had occasion to note: "Money is frequently borrowed in one state, by a corporation created in another. The numerous banks established by different states are in the constant habit of contracting and dealing with one another. . . . These usages of commerce and trade have been so general and public, and have been practiced for so long a period of time, and so generally acquiesced in by the states, that the Court cannot overlook them . . . ." *Bank of Augusta* v. *Earle,* 13 Pet. 519, 590–591 (1839). Examples of this interstate loan market have been noted by historians of American banking. See, *e. g.,* 1 F. Redlich, The Molding of American Banking 49 (1968); 1 F. James, The Growth of Chicago Banks 546 (1938); Breckenridge, Discount Rates in the United States, 13 Pol. Sci. Q. 119, 136–138 (1898). Evidence of this market is to be found in the numerous judicial decisions in cases arising out of interstate loan transactions. See, *e. g., Woodcock* v. *Campbell,* 2 Port. 456 (Ala. 1835); *Clarke* v. *Bank of Mississippi,* 10 Ark. 516 (1850); *Planters Bank* v. *Bass,* 2 La. Ann. 430 (1847); *Knox* v. *Bank of United States,* 27 Miss. 65 (1854); *Bard* v. *Poole,* 12 N. Y. 495 (1855); *Curtis* v. *Leavitt,* 15 N. Y. 9 (1857). After passage of the National Bank Act of 1864, cases involving interstate loans begin to appear with some frequency in federal courts. See, *e. g., In re Wild,* 29 F. Cas. 1211 (No. 17,645) (SDNY 1873); *Cadle* v. *Tracy,* 4 F. Cas. 967 (No. 2,279) (SDNY 1873); *Farmers' Nat. Bank* v. *McElhinney,* 42 F. 801 (SD Iowa 1890); *Second Nat. Bank of Leavenworth* v. *Smoot,* 9 D. C. 371 (1876).

We cannot assume that Congress was oblivious to the existence of such common commercial transactions. We find it implausible to conclude, therefore, that Congress meant through its silence to exempt interstate loans from the reach of § 30. We would certainly be exceedingly reluctant to read such a hiatus into the regulatory scheme of § 30 in the absence of evidence of specific congressional intent. Petitioners have adduced no such evidence.

Petitioners' final argument is that the "exportation" of interest rates, such as occurred in this case, will significantly impair the ability of States to enact effective usury laws. This impairment, however, has always been implicit in the structure of the National Bank Act, since citizens of one State were free to visit a neighboring State to receive credit at foreign interest rates.[31] Cf. 38 Cong. Globe, 38th Cong., 1st Sess., 2123 (1864). This impairment may in fact be accentuated by the ease with which interstate credit is available by

---

[31] When the National Bank Act of 1864 originally passed the House, it imposed a uniform maximum rate of interest of 7% on all national banks. See Cong. Globe, 38th Cong., 1st Sess., 1866 (1864) (remarks of Sen. Sherman); J. Knox, A History of Banking in the United States 238–239, 248, 255–256 (1903, 1969 reprint). Such a provision, of course, would have eliminated interstate inequalities among national banks resulting from differing state usury rates.

The present § 85 provides that national banks may charge interest "at the rate allowed by the laws of the State . . . where the bank is located, or at a rate of 1 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal reserve bank in the Federal reserve district where the bank is located, or in the case of business or agricultural loans in the amount of $25,000 or more, at a rate of 5 per centum in excess of the discount rate on ninety-day commercial paper in effect at the Federal Reserve bank in the Federal Reserve district where the bank is located, whichever may be the greater, and no more . . . ." See §§ 201, 206 of Pub. L. 93–501, 88 Stat. 1558, 1560. To the extent the enumerated federal rates of interest are greater than permissible state rates, state usury laws must, of course, give way to the federal statute.

mail through the use of modern credit cards. But the protection of state usury laws is an issue of legislative policy, and any plea to alter § 85 to further that end is better addressed to the wisdom of Congress than to the judgment of this Court.

*Affirmed.*