In the

# United States Court of Appeals

### For the Seventh Circuit

No. 08-3322

LAURA M. SWANSON, individually
and on behalf of a class,

*Plaintiff-Appellant,*

*v.*

BANK OF AMERICA, N.A., and
FIA CARD SERVICES, N.A.,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 08 C 184—**Amy J. St. Eve**, *Judge*.

ARGUED FEBRUARY 23, 2009—DECIDED MARCH 19, 2009

Before EASTERBROOK, *Chief Judge*, and KANNE and
EVANS, *Circuit Judges*.

EASTERBROOK, *Chief Judge*.   When Bank of America
extended credit to Laura Swanson, it told her that, if
excessive purchases caused her balance to exceed the
$5,000 credit limit at the end of two months in any
rolling 12-month period, it could increase her interest
rate from 18% to 32% per annum. Later the Bank sent

Swanson a notice amending the terms to provide that the higher, penalty interest rate would take effect at the beginning of the billing cycle to which it applied. Swanson agreed to these terms by continuing to use her credit card.

Swanson's account was over her credit limit at the close of the billing cycles in August, November, and December 2007. The Bank raised her interest rate effective at the start of the November–December billing cycle. That cost Swanson approximately $60 more than it would if the Bank had notified her in December of its decision to raise the rate, and then had applied the increase at the start of the December 2007 to January 2008 billing cycle. Swanson contends in this suit that a regulation issued by the Federal Reserve under the Truth in Lending Act forbids rate changes that apply to the entire billing cycle in which the change occurs. She seeks a refund of the $60 plus statutory penalties. Swanson concedes that her contract with the Bank allowed it to act exactly as it did, but she insists that the regulation vitiates her consent. The district judge, however, held that Swanson's assent to the terms is conclusive. 566 F. Supp. 2d 821 (N.D. Ill. 2008).

The regulation on which Swanson relies is 12 C.F.R. §226.9(c), which provides:

> (1) Whenever any term required to be disclosed under §226.6 is changed or the required minimum periodic payment is increased, the creditor shall mail or deliver written notice of the change to each consumer who may be affected. The notice shall be mailed or delivered at least 15 days prior to the effective date of the change. The 15-day

timing requirement does not apply if the change has been agreed to by the consumer, or if a periodic rate or other finance charge is increased because of the consumer's delinquency or default; the notice shall be given, however, before the effective date of the change.

(2) No notice under this section is required when the change involves late payment charges, charges for documentary evidence, or over-the-limit charges; a reduction of any component of a finance or other charge; suspension of future credit privileges or termination of an account or plan; or when the change results from an agreement involving a court proceeding, or from the consumer's default or delinquency (other than an increase in the periodic rate or other finance charge).

The interest rate is a "term required to be disclosed under §226.6". Swanson contends that by raising the rate from 18% to 32% the Bank changed a "term" without 15-day notice. Yet §226.9(c) says that the 15-day notice rule does not apply "if the change has been agreed to by the consumer". Swanson agreed that the Bank could increase her rate if she went over her credit limit, but she insists that the change can't go back to the start of the billing cycle, because that "effective date" precedes the notice. For its part, the Bank maintains that post-dating the new rate is an over-the-limit charge covered by subsection (b)—and it adds that the word "term" in subsection (a) should be understood to deal exclusively with the rules set by contract rather than with the periodic interest rate.

The last sentence of §226.9(c)(1) refers to notice of "a periodic rate or other finance charge", not to a change in a "term."

As the Bank sees things, if no contractual term has been changed, the last sentence of §226.9(c)(1) never comes into play. A retroactive change in the interest rate is no different from a fee in the over-limit month (here, a fee of $60), and there is no need to give advance notice before contractually authorized fees may be assessed. The Bank gives as another example of its reading the treatment of introductory rates—for example, the contract specifies 10% interest for six months, rising to 18% in the seventh. That change does not require a separate notice, the Bank observes (and Swanson concedes); and if a planned increase in interest does not call for notice, then an increase allowed by a combination of contract and over-limit charges also does not require advance notice, the Bank wraps up.

We have said enough to show that the regulation does not squarely address what notice (if any) is required when the terms of a contract authorize an increase in the rate of interest. So we are entitled to consult the Board's commentary, which is authoritative if within the bounds of reasonableness. *Ford Motor Credit Co. v. Milhollin*, 444 U.S. 555 (1980). The Board's Official Commentary to §226.9(c) includes this language:

> No notice of a change in terms need be given if the specific change is set forth initially, such as: Rate increases under a properly disclosed variable-rate plan, a rate increase that occurs when an em-

ployee has been under a preferential rate agree-
ment and terminates employment, or an increase
that occurs when the consumer has been under an
agreement to maintain a certain balance in a sav-
ings account in order to keep a particular rate and
the account balance falls below the specified
minimum. In contrast, notice must be given if the
contract allows the creditor to increase the rate at
its discretion but does not include specific terms
for an increase (for example, when an increase may
occur under the creditor's contract reservation
right to increase the periodic rate) . . . .

12 C.F.R. Part 226, Supp. 1, §226.9(c), Comment 1. The first
sentence of this comment shows that lenders need not
give separate notice before applying pre-authorized rate
increases. The comment groups variable interest (of the
sort where the rate rises after six months or a year) with
penalty interest (where, for example, the consumer fails
to maintain a minimum balance). The Bank argues, and the
district court concluded, that this sentence permits the
practice about which Swanson complains. But this has not
led Swanson to give up. She contends that the second
sentence governs because the Bank has discretion *not* to
raise the rate (and did not do so for Swanson until she
went over limit for a third month). To this the Bank
replies that the lender always has discretion to give a
consumer a break; if as §226.9(c)(2) says it can lower
an interest rate without notice, why can't it defer ap-
plying a penalty rate without notice? Cf. *Wisconsin Electric
Power Co. v. Union Pacific R.R.*, No. 08-2693 (7th Cir. Mar. 2,
2009), slip op. 6–10 (explaining why courts do not read

contracts to penalize entities that give a break to their trading partners).

So far one court of appeals and at least six district courts have interpreted the ambiguous Comment 1 to the ambiguous §226.9(c). All have held, as our district court did, that banks may apply higher, penalty rates of interest to the entire billing cycle in which the consumer's default occurs. *Evans v. Chase Bank USA, N.A.*, 267 Fed. App'x 692 (9th Cir. 2008) (nonprecedential disposition); *Shaner v. Chase Bank, USA, N.A.*, 570 F. Supp. 2d 195 (D. Mass. 2008); *Williams v. Washington Mutual Bank*, 2008 U.S. Dist. LEXIS 5325 (E.D. Cal. Jan. 11, 2008); *Augustine v. FIA Card Services, N.A.*, 2007 U.S. Dist. LEXIS 66382 (E.D. Cal. Aug. 30, 2007) (appeal pending); *Barrer v. Chase Bank, USA, N.A.*, 2007 U.S. Dist. LEXIS 26571 (D. Ore. Jan. 23, 2007); *McCoy v. Chase Manhattan Bank USA*, 2006 U.S. Dist. LEXIS 97257 (C.D. Cal. Aug. 10, 2006); *Penner v. Chase Bank USA, N.A.*, 2006 U.S. Dist. LEXIS 53179 (W.D. Wash. Aug. 1, 2006). These decisions are sensible, and we agree with them.

With the regulation and the comment both ambiguous, there is no good reason to override the contract between Swanson and the Bank—a contract that unambiguously authorizes the Bank to act as it did. Moreover, it would be lawful for a bank to impose an over-limit fee (say, $75) in the first month, then increase the periodic rate of interest only for successive months. As the Bank's actual practice of back-dating the penalty rate has the same economic effect as a fee in the initial month, it is hard to see why one method should be allowed and the other prohibited. The point of advance-notice requirements is

to allow customers to shop for better rates. But customers are not entitled to avoid fees for completed defaults, such as late (or skipped) payments, or over-limit charges. Structuring penalty interest to have the same effect as a penalty fee in the initial month therefore does not undermine the goal of advance-notice requirements. Swanson and others in her position still can shop for better rates for future months.

There is one more reason not to create a conflict: The Federal Reserve has changed the rules, effective July 1, 2010, to delay the effectiveness of penalty rate increases. The Board did this by adding a new subsection, §226.9(g), that prevents retroactive changes and requires 45-day notice of higher interest rates, expressly overriding any contractual provisions authorizing swifter changes. 74 Fed. Reg. 5244, 5414–15 (Jan. 29, 2009). It would be inappropriate to give this new language retroactive effect by reading §226.9(c) as if the new §226.9(g) had been there all along. The reason the Federal Reserve added §226.9(g) was precisely that it recognized that the existing regulation did *not* prohibit penalty rates that begin at the start of the billing cycle in which the consumer's default occurs. The Federal Register has an extensive commentary on §226.9(g) in which the agency recognizes that §226.9(g) will change the way penalty-default interest rates are applied. See 74 Fed. Reg. at 5350–56. The Supreme Court held in *Milhollin* that courts must honor the Board's commentary on its rules; we honor it by taking the Board at its word that §226.9(g) makes a real change—not only from 15 to 45 days of notice, but also from a start-of-cycle approach to one in which

the higher rate must be deferred for a billing cycle and a half.

Swanson effectively wants the benefit of tomorrow's regulations, today. But the Federal Reserve set July 1, 2010, as the effective date. The Bank wins under the law now in force.

Swanson contends that she is entitled to relief under Illinois law even if not under federal law. The bank with which she dealt is based in Delaware, however, and Illinois may not override interest rates, charged by a national bank, that are lawful under contracts and the rules of the bank's home state. 12 U.S.C. §85; *Beneficial National Bank v. Anderson*, 539 U.S. 1 (2003); *Marquette National Bank of Minneapolis v. First of Omaha Service Corp.*, 439 U.S. 299 (1978). Not that Illinois has tried; it treats compliance with the Truth in Lending Act as a defense to any claim under state law. See *Lanier v. Associates Finance, Inc.*, 114 Ill. 2d 1, 17, 499 N.E.2d 440, 447 (1986). So the district court properly granted judgment for the Bank on both state and federal theories.

AFFIRMED