George B. JONES, Plaintiff,

v.

BANKBOSTON, N.A., et al., Defendants.

No. Civ.A. 99–0971–CB–C.

United States District Court, S.D. Alabama, Southern Division.

Oct. 2, 2000.

Scott E. Deacon, Mobile, AL, for plaintiff.

Michael Edwin Gabel, Kenneth J. Reimer, Mobile, AL, for defendant.

## ORDER ON MOTION TO REMAND

BUTLER, Chief Judge.

This matter is before the Court on the plaintiff's motion to remand. (Doc. 2). The plaintiff's motion includes a brief, to which the defendants have responded. (Doc. 9). After careful consideration of the parties' arguments, the Court concludes that the motion to remand is due to be granted.

## BACKGROUND

The plaintiff filed an individual action on March 31, 1998 in the Circuit Court of Escambia County, Alabama against the defendants. The plaintiff filed an amended complaint in November 1998 on behalf of a putative class of persons that had obtained credit cards from the defendants and been charged an interest rate higher than the rate described in the defendants' introductory materials.

The defendants filed a notice of removal, asserting federal jurisdiction on the basis of diversity of citizenship, and the plaintiff responded by filing a motion to remand. While the action was pending in this Court, the plaintiff filed a motion for leave to file a second amended complaint. By order dated August 4, 1999, this Court granted the motion to remand and denied the motion to amend for lack of subject matter jurisdiction.

On September 27, 1999, the plaintiff filed a second amended complaint in the Circuit Court of Escambia County. The defendants filed a second notice of removal, prompting the present motion to remand.

## CONTENTIONS

The notice of removal asserts that removal jurisdiction under 28 U.S.C. § 1441 exists because this case "arise[s] under the laws of the United States." *Id.* § 1331. On its face, the second amended complaint asserts no federal claims, and the defendants acknowledge that application of the "well-pleaded complaint" rule ordinarily would bar removal. They insist, however, that federal question removal jurisdiction nevertheless exists under the doctrine of "complete preemption."

In particular, the defendants argue that the plaintiffs' second amended complaint includes a claim that effectively accuses the defendants of charging interest in excess of that allowed by state law and that a federal law, the National Bank Act, completely preempts state law claims for excessive interest and transforms them into federal claims that support federal question removal jurisdiction. The plaintiff denies that complete preemption applies in this case and further argues that the defendants' notice of removal was untimely.

The defendants rely on a number of cases that have applied the complete preemption doctrine to state law claims for excessive interest so as to uphold federal removal jurisdiction. None of these cases is binding on this Court, and they are persuasive only to the extent they employ an analysis that is both thorough and consonant with that required by the Supreme Court and the Eleventh Circuit. The Court finds each of the defendant's authorities lacking in one or both particulars and accordingly affords them little weight. The Court's own analysis reveals that application of the complete preemption doctrine is inappropriate in this case. Accordingly, the Court does not reach the plaintiff's alternate ground that the notice of removal was untimely.

## ANALYSIS

The complete preemption doctrine arrived, unheralded, in *Avco Corp. v. Aero Lodge No. 735, International Association of Machinists & Aerospace Workers*, 390 U.S. 557, 88 S.Ct. 1235, 20 L.Ed.2d 126 (1968). Without dissent and with little discussion, the Supreme Court concluded that a state court complaint asserting only state law causes of action in connection with alleged violations of a collective bargaining agreement's no-strike clause was properly removable to federal court. The Court first quoted *Textile Workers Union of America v. Lincoln Mills*, 353 U.S. 448, 77 S.Ct. 912, 1 L.Ed.2d 972 (1957), which held that federal law, including a federal common law to be developed by the courts, governs suits under Section 301(a) of the Labor Management Relations Act ("LMRA"), 29 U.S.C. § 185(a). The Court then continued:

> An action arising under § 301 is controlled by federal substantive law even though it is brought in a state court. [citations omitted]. Removal is but one aspect of "the primacy of the federal judiciary in deciding questions of federal law." See *England v. Medical Examiners*, 375 U.S. 411, 415–16, 84 S.Ct. 461, 11 L.Ed.2d 440....
>
> It is thus clear that the claim under this collective bargaining agreement is one arising under the "laws of the United States" within the meaning of the removal statute. 28 U.S.C. § 1441(b). It likewise seems clear that this suit is within the "original jurisdiction" of the District Court within the meaning of 28 U.S.C. §§ 1441(a) and (b).

390 U.S. at 560, 88 S.Ct. 1235.

The *Avco* Court provided no further guidance concerning the content or parameters of this doctrine. Indeed, it remained nameless for another fifteen years, until the Court, in *Franchise Tax Board v. Construction Laborers Vacation Trust*, 463 U.S. 1, 103 S.Ct. 2841, 77 L.Ed.2d 420 (1983), characterized *Avco* as "stand[ing] for the proposition that if a federal cause of action *completely preempts* a state

cause of action any complaint that comes within the scope of the federal cause of action necessarily 'arises under' federal law." *Id.* at 23–24, 103 S.Ct. 2841 (emphasis added). The *Franchise Tax Board* Court identified the "necessary ground of decision" in *Avco* as being that "the preemptive force of § 301 is so powerful as to displace entirely any state cause of action 'for violation of contracts between an employer and a labor organization' [such that] [a]ny such suit is purely a creature of federal law." *Id.* at 23, 103 S.Ct. 2841. However, the Court did not explicate how a court may determine when a federal statute's preemptive effect is "so powerful" as to "completely preempt" state causes of action within its scope.

The defendant in *Franchise Tax Board* urged extension of *Avco* to the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 et seq., so as to completely preempt the plaintiff taxing authority's state law suit for monetary and declaratory relief resulting from the defendant's failure to comply with levies issued pursuant to state statute. 463 U.S. at 5–6, 103 S.Ct. 2841. The Court demurred on the grounds that the federal statute provided the plaintiff no cause of action as an alternative to the state causes of action being pursued. *Id.* at 24–27, 103 S.Ct. 2841.

Four years later, the Supreme Court returned to the complete preemption arena. In its most illuminating discussion of the doctrine, the Court in *Metropolitan Life Insurance Co. v. Taylor*, 481 U.S. 58, 107 S.Ct. 1542, 95 L.Ed.2d 55 (1987), held that the plaintiff's state law contract and tort claims were completely preempted by ERISA. The Court first noted that ERISA provided an alternative federal remedy to the plaintiff's preempted state remedy, overcoming the threshold difficulty that doomed the plaintiff's complete preemption argument in *Franchise Tax Board* and requiring the *Metropolitan Life* Court to address the complete preemption issue. 481 U.S. at 64, 107 S.Ct. 1542.

The *Metropolitan Life* Court described complete preemption as an "extraordinary pre-emptive power." 481 U.S. at 65, 107 S.Ct. 1542. It then reaffirmed that "the touchstone of the federal court's removal jurisdiction is ... the intent of Congress" and identified the relevant intent as one "to make causes of action within the scope of the civil enforcement provisions of [29 U.S.C.] § 502(a) removable to federal court." *Id.* at 66, 107 S.Ct. 1542. In search of such intent, the Court first noted that ERISA contains both a "unique[ly]" expansive express preemption clause and a civil enforcement provision lying "at the heart" of the statute. 481 U.S. at 65, 107 S.Ct. 1542. Nevertheless, the Court found itself "reluctant" to ground complete preemption on these considerations. *Id.*

The Court then turned to ERISA's jurisdictional provision, which it found—without express comparison of the language or explanation of its significance—to "closely paralle[l]" that of the LMRA so as to trigger "[t]he presumption that similar language in two labor law statutes has a similar meaning." 481 U.S. at 65, 107 S.Ct. 1542.

Finally, the Court turned to the legislative history of ERISA's civil enforcement provision, which stated that " '[a]ll such actions [to enforce benefit rights or to recover benefits] in Federal or State courts are to be regarded as arising under the law of the United States *in similar fashion to those brought under section 301 of the Labor–Management Relations Act of 1947.*' " 481 U.S. at 65, 107 S.Ct. 1542 (emphasis added) (quoting H.R.Conf.Rep. No. 93–1280, at 327 (1974) (emphasis added)). This language tied the breadth of federal question jurisdiction under ERISA to that existing under the LMRA. ERISA was enacted in 1974, six years after *Avco* had made clear that federal question jurisdiction under the LMRA extended to state law suits brought in state court. Thus, the Supreme Court concluded that "[n]o more specific reference to the *Avco* rule can be expected...." 481 U.S. at 66, 107 S.Ct. 1542.

The Eleventh Circuit, outside the context of the LMRA and ERISA, has directly addressed the complete preemption doctrine only once. *See Blab T.V., Inc. v. Comcast Cable Communications, Inc.,* 182 F.3d 851, 856 (11th Cir.1999). In *Blab T.V.,* the plaintiff was a local, unaffiliated television programmer and the defendant a cable operator. The defendant initially carried the plaintiff's programming but ultimately stopped, claiming the parties' contract had expired without renewal. The plaintiff filed a complaint in state court, asserting claims for breach of contract and fraud. The defendant removed to federal court, asserting that section 612 of the Cable Communications Policy Act of 1984 (codified at 47 U.S.C. § 532) completely preempted the plaintiff's state law claims, establishing federal question jurisdiction despite the plaintiff's failure to assert a federal claim. After the district court denied the plaintiff's motion to remand, the Eleventh Circuit accepted interlocutory review. 182 F.3d at 853–54.

While the *Blab T.V.* Court expressly "avoided adopting a specific test to be applied to all future claims of complete preemption in this circuit," 182 F.3d at 858, it identified certain parameters of the complete preemption doctrine that apply to all complete preemption analyses. First, the Court reaffirmed that complete preemption is an "extraordinary" result and not a "common" one. 182 F.3d at 858 n. 3. It further noted that the Supreme Court "recognizes the existence of the complete preemption doctrine ... hesitatingly and displays no enthusiasm to extend the doctrine into areas beyond the LMRA and ERISA." *Id.* at 856. Thus, any analysis that would convert complete preemption from an extraordinary occurrence to a common one is to be avoided.

Second, "[t]he complete preemption analysis thus focuses primarily upon evaluating Congress's intent, which is the 'touchstone' of federal court removal jurisdiction." 182 F.3d at 857 (quoting *Metropolitan Life v. Taylor,* 481 U.S. at 66, 107

S.Ct. 1542). The intent at issue is an " 'inten[t] to grant a defendant the ability to remove the adjudication of the cause of action to a federal court by transforming the state cause of action into a federal [one].' " *Id.* (quoting Miller, *Artful Pleading: A Doctrine in Search of Definition,* 76 Tex.L.Rev. 1781, 1797–98 (1998) (hereinafter, *"Artful Pleading "*)). Thus, whatever factors a court may consider in performing its complete preemption analysis, they are relevant and weighty only to the extent they reflect on Congress's intent to transform a state cause of action into a federal one.

Citing cases from the Fourth, Fifth and Tenth Circuits, the *Blab T.V.* Court distilled four factors that other appellate courts have considered: (1) the existence vel non of "ordinary" preemption of state law; (2) the existence vel non of a federal cause of action; (3) the federal statute's jurisdictional language; and (4) its legislative history. 182 F.3d at 857. The *Blab T.V.* Court then focused its attention on the latter two inquiries, extending them to include the language and legislative history not only of the jurisdictional provision but of the entire act as well as its amendments. *Id.* at 857–58. The Court concluded that "section 612 of the Cable Act and its legislative history fail to demonstrate the requisite congressional intent to convert [the plaintiff's] state law claims into claims arising under federal law." *Id.* at 858.

■ The Court's emphasis on the legislation itself and its legislative history demonstrates important points concerning the relative significance of various considerations. First, the mere existence of a federal cause of action does not compensate for the lack of more direct indicia of congressional intent: "[T]he provision of a federal cause of action, while relevant, is not dispositive of the issue of congressional intent." 182 F.3d at 859 n. 3. Otherwise, because Congress has created many federal causes of action, complete preemption would become a commonplace rather than an oddity. *Id.*

■ Second, that the statute accomplishes "ordinary" preemption, and that the asserted state law claims are the "legal equivalent" of the federal cause of action, are likewise insufficient to overcome the lack of more direct evidence of congressional intent. 182 F.3d at 859. The *Blab T.V.* Court expressly noted that it would not consider these issues because they "are unnecessary to our resolution of the complete preemption issue." *Id.* If these considerations were capable of establishing complete preemption, either standing alone or in combination with the other evidence before it, the Court would have been required to address them.

■ The Court's analysis also demonstrates important points concerning the significance of statutory language and its legislative history. First, the existence of jurisdictional language similar to that expressed under the LMRA, while it "supports" complete preemption, is insufficient to overcome the lack of more direct evidence of congressional intent. 182 F.3d at 857. Second, the lack of language in the legislative history indicating that Congress desired the statute's jurisdictional reach to function as under the LMRA is a "persuasive argument against finding complete preemption." *Id.* Third, statutory language, within the act but beyond the alleged source of complete preemption, that "reveals a broad policy of preserving state authority, except in areas in which the exercise of this authority would be inconsistent with federal law," serves to "counse[l] against" complete preemption. *Id.* at 857–58. Fourth, Congress's "stated desire to encourage the development of 'Federal case law precedent' in th[e] area" alleged to be completely preempted is such a "common featur[e]" of congressional enactments that it "does not provide sufficient evidence of congressional intent to invoke the complete preemption doctrine." *Id.* at 858. Fifth, the creation of federal standards to be applied to cable operators offering access to commercial leased access channels "is not so unusual that it reveals an intent to replicate the jurisdictional force of the LMRA or ERISA." *Id.*

■ The *Blab T.V.* Court's restrictions on the significance of various circumstances are cumulative. Thus, the existence of a federal cause of action that preempts and replaces the asserted state law claim; jurisdictional language similar to that governing the LMRA; an express desire to encourage federal case law; and the creation of federal standards governing the defendant's conduct, even considered in combination, does not adequately reflect the necessary congressional intent, at least where the statute as a whole preserves a considerable range of state activity and lacks language indicating that its jurisdictional reach is co-extensive with that of the LMRA.

The National Bank Act was enacted in 1863. The National Bank Act of 1864 replaced the prior act, carrying over certain provisions and adding others. *Mercantile National Bank v. Langdeau,* 371 U.S. 555, 558–60, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963); *Spellman v. Meridian Bank,* 1995 WL 764548 at *21–23 (Scirica, J., dissenting). Section 30 of the National Bank Act of 1864, now codified at 12 U.S.C. §§ 85–86, established federal standards for interest rates charged by national banks, *id.* § 85, and provided a civil remedy for their violation. *Id.* § 86.

■ Applying the analysis of *Blab T.V.,* the National Bank Act does not completely preempt state law claims for excessive interest. The Act does create a federal cause of action for excessive interest charges by national banks, and it may be assumed for present purposes that the plaintiff's asserted claims are the legal equivalent of the federal cause of action and that they are subject to "ordinary" preemption.[1] Under *Blab T.V.,* these facts alone, if unaccompanied by sufficient evidence from the statute and its legislative

history of the requisite congressional intent, are inadequate to justify invocation of the complete preemption doctrine.

The defendants have identified no language within the National Bank Act or embedded in its legislative history that evidences such intent. Instead, finding comfort in numbers, they cite a list of cases from other jurisdictions which, they say, represent a "consensus" that complete preemption applies to state law claims falling within the ambit of 12 U.S.C. § 85. Complete preemption, however, is determined by analysis, not arithmetic, and the analysis offered by the courts on which the defendants rely fails to comport with that required by the Eleventh Circuit.

The only appellate opinion favorable to the defendants is *M. Nahas & Co. v. First National Bank,* 930 F.2d 608 (8th Cir. 1991). In its brief discussion, the *Nahas* Court interpreted *Avco v. Aero Lodge* as standing for the proposition that complete preemption "is most appropriate where Congress has created an exclusive federal remedy that displaces any overlapping or inconsistent state remedies." *Id.* at 612. Because "Section 86 is an exclusive federal remedy," the *Nahas* Court concluded the plaintiff's complaint "was necessarily federal in nature and properly removable." *Id.*

Thus, the only justification offered by the *Nahas* Court for its ruling was that the National Bank Act accomplishes "ordinary" preemption of state law claims for excessive interest and provides an alternative federal cause of action for the preempted state claim. These are precisely the considerations that the Eleventh Circuit has deemed inadequate to overcome the absence of language in the statute or its legislative history reflecting the necessary congressional intent. *See also Partin*

1. The defendants devote a portion of their brief to arguing that the charges objected to by the plaintiff constitute "interest" within the meaning of Section 85. Because the plaintiff's claims are not completely preempted in any event, the Court need not—and should not—determine this issue. *See Blab T.V. v. Comcast Cable,* 182 F.3d at 859 ("Because we have concluded that the district court lacked jurisdiction under the complete preemption doctrine, we necessarily must avoid further discussion of these issues [ordinary preemption and legal equivalency], which go directly to the merits of [the plaintiff's] claims.").

*v. Cableview, Inc.*, 948 F.Supp. 1046, 1049–50 (S.D.Ala.1996) (criticizing *Nahas* as confusing ordinary preemption with complete preemption).

The Eighth Circuit's reliance on the existence of an "exclusive federal remedy," without any further showing of congressional intent, is not only inconsistent with *Blab T.V.*, by which this Court is bound, but also appears to contradict *Metropolitan Life v.. Taylor* itself. Before even analyzing the complete preemption issue, the *Metropolitan Life* Court acknowledged both that ERISA preempted the plaintiff's state law claims and that ERISA provided the plaintiff an alternative federal remedy. *See* 481 U.S. at 64, 107 S.Ct. 1542. Were the existence of an "exclusive federal remedy" the only requirement for complete preemption, the *Metropolitan Life* Court would have concluded its analysis at this point and declared the plaintiff's claims completely preempted. Rather than doing so, the Court noted it would be "reluctant" to ground complete preemption on so slender a basis and instead launched into its explication of the statute and its legislative history; only after completing this study did it find that "Congress has clearly manifested an intent to make causes of action within the range of the civil enforcement provisions of § 502(a) removable to federal court." *Id.* at 66, 107 S.Ct. 1542. This Court is aware of no other appellate court utilizing the Eighth Circuit's lenient test for complete preemption and is neither empowered nor inclined to adopt it.[2]

The other opinions cited by the defendants are equally unpersuasive. *Nelson v.* *Citibank*, 794 F.Supp. 312, 316 (D.Minn. 1992), and *Hill v. Chemical Bank*, 799 F.Supp. 948, 952 (D.Minn.1992), arose in the Eighth Circuit and were therefore bound by *Nahas*, which they applied without further analysis.[3] *Beeman v. MBank Houston, N.A.*, 691 F.Supp. 1027 (S.D.Tex. 1988), is a one-paragraph opinion that relied, without analysis, on a secondary authority that in fact noted "the National Bank Act comes into the case only by way of defense to a state-created claim [and] [u]nder usual standards ... should not be held to 'arise under' federal law."[4] *Ament v. PNC National Bank*, 825 F.Supp. 1243, 1250–51 (W.D.Pa.1992), relied on *Nahas* without offering any additional evidence of congressional intent. *Goehl v. Mellon Bank*, 825 F.Supp. 1239, 1241–42 (E.D.Pa. 1993), cited prior cases but did not amplify their analysis. *Watson v. First Union National Bank*, 837 F.Supp. 146, 149 (D.S.C.1993), simply "concur[red] with the majority view" and offered no analysis of its own. *Hunter v. Rich's Department Stores*, 945 F.Supp. 1500, 1509–10 (N.D.Ala.1995), likewise engaged in no independent analysis but simply cited "the great weight of authority."

The single case cited by the defendants deserving of extended treatment is *Monday v. Coast to Coast Wireless Cable*, 1997 WL 114874 (M.D.Ala.1997). The *Monday* Court identified three factors, each "critical to a finding of 'complete preemption' ": (1) "evidence of congressional intent to make the state claim falling within the scope of the relevant statute removable to federal court"; (2) "the federal law must

---

2. Given its relaxed approach to complete preemption, it is not surprising that the Eighth Circuit apparently has more often found complete preemption than any other. *See, e.g., Gore v. Trans World Airlines*, 210 F.3d 944 (8th Cir.2000) (Railway Labor Act); *Husmann v. Trans World Airlines, Inc.*, 169 F.3d 1151 (8th Cir.1999) (Warsaw Convention); *Peters v. Union Pacific Railroad Co.*, 80 F.3d 257 (8th Cir.1996) (Federal Railroad Safety Act). The latter opinion has been criticized as finding complete preemption based solely on a finding of "preemption simpliciter without any additional requirement to support removal."

Green, *Complete Preemption—Removing the Mystery from Removal*, 86 Calif.L.Rev. 363, 383 (1998).

3. The Eighth Circuit recently applied complete preemption to the National Bank Act a second time, citing *Nahas* but engaging in no further analysis. *Krispin v. May Department Stores Co.*, 218 F.3d 919, 924 (8th Cir.2000).

4. Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice & Procedure* § 3571 at 181–82 (2nd ed.1984).

also 'displace' the state-law claim with a cause of action"; and (3) "the jurisdictional and enforcement provisions in the LMRA or ERISA must have a close parallel in the federal law at issue." *Id.* at *3. The *Monday* Court concluded that each factor was satisfied, establishing complete preemption. *Id.* at *4–7.

As noted, the Eleventh Circuit in *Blab T.V.* made plain that the second and third factors identified by the *Monday* Court will not alone support complete preemption. Thus, the issue resolves into one of examining Congress's intent as reflected in the National Bank Act and its legislative history. The *Monday* Court recognized that "[n]o such clear congressional intent will be found in congressional documents relating to the passage of the NBA." 1997 WL 114874 at *5. Instead, the Court turned to judicial indications of Congress's intent. Even assuming that judicial impressions of congressional intent are an acceptable substitute for Congress's own statements of its intent, the language quoted and relied on by the *Monday* Court notes only that Section 30 of the National Bank Act of 1864 was designed to place national banks on equal, and in some ways superior, footing as compared with state banks. *See id.* at *6. The point is no doubt correct, but it provides an inadequate platform for the *Monday* Court's conclusion that "usury actions against national banks were intended by Congress to 'arise under' federal law," 1997 WL 114874 at *6. Congress may, and often does, provide a class of constituents certain advantages without providing other advantages as well, and there is no clear connection between a desire to favor national banks with respect to the interest rates they may charge and an intent to convert into federal claims all state law claims against them for charging excessive interest. To extrapolate the latter from the former would transport complete preemption from the exotic to the mundane, in violation of the mandate that complete preemption remain an "extraordinary" phenomenon.

The *Monday* Court also cited cases for the unremarkable propositions that the National Bank Act created a " 'new right' " and that actions under the Act are " 'regulated by federal law' and 'founded on federal statute.' " 1997 WL 114874 at *6 (quoting *Farmers' & Mechanics' National Bank v. Dearing*, 91 U.S. 29, 35, 23 L.Ed. 196 (1875) and *Roper v. Consurve, Inc.*, 578 F.2d 1106, 1115 (5th Cir.1978), *aff'd*, 445 U.S. 326, 100 S.Ct. 1166, 63 L.Ed.2d 427 (1980)). These propositions would appear to be equally true of any federal cause of action and furnish no basis for concluding that Congress intended the extraordinary result of complete preemption. *See Blab T.V. v. Comcast Cable*, 182 F.3d at 858 ("common features" of congressional enactments do not provide "sufficient evidence of congressional intent to invoke the complete preemption doctrine").

The *Monday* Court also found that the jurisdictional provision of the National Bank Act "closely parallels" those of the LMRA and ERISA. 1997 WL 114874 at *7. As noted, the existence of jurisdictional language parallel to that in ERISA or the LMRA will not compensate for the lack of clearer indications of congressional intent. Therefore, even if the *Monday* Court's determination were correct, it could not alter the result that complete preemption does not apply to the National Bank Act. More fundamentally, however, the jurisdictional provision of the Act does not in fact closely parallel those of the LMRA and ERISA in any sense significant to complete preemption analysis.

As a threshold matter, the *Metropolitan Life* Court did not state that it considered the specific language of the LMRA's jurisdictional statute to reflect a congressional intent to transform state causes of action into federal ones for the purpose of supporting federal question removal jurisdiction; what the Supreme Court found significant was that ERISA's subsequently enacted jurisdictional provision closely paralleled that of the LMRA. 481 U.S. at 65, 107 S.Ct. 1542.[5] This parallelism was

**5.** A comparison of the jurisdictional provisions of the LMRA and ERISA reveals no

significant because it triggered a "presumption that similar language in two labor law statutes has a similar meaning." *Id.* That is, Congress's employment of similar jurisdictional language in ERISA suggested that Congress desired federal jurisdiction under ERISA to be co-extensive with that under the LMRA. Because, when Congress enacted ERISA in 1974, it was aware that the *Avco* Court had in 1968 discerned complete preemption in the LMRA, its use of similar jurisdictional language suggested an intent to extend complete preemption removal jurisdiction to ERISA.

Thus, the significance to complete preemption analysis of jurisdictional language paralleling that of the LMRA is dependent on whether the jurisdictional language was enacted after the 1968 *Avco* decision; only then may it be inferred that Congress, by its use of such language, desired to mimic the complete preemption embedded in the LMRA. Because the National Bank Act's jurisdictional provision was enacted a century before *Avco*, it cannot be construed as an effort to invoke complete preemption by parallelism.

Even if closely parallel jurisdictional language carried any significance with respect to statutes enacted before 1968, the National Bank Act's jurisdictional provision does not closely parallel that of the LMRA. The LMRA's jurisdictional provision allows suits within its scope to be brought "in any district court of the United States having jurisdiction of the parties, without respect to the amount in controversy or without regard to the citizenship of the parties." 29 U.S.C. § 185(a). The National Bank Act of 1863 provided that "suits ... may be had in any circuit, district or territorial court of the United States held within the district in which such association may be established.'" *Mercantile National Bank v. Langdeau*, 371 U.S. 555, 559, 83 S.Ct. 520, 9 L.Ed.2d 523 & Appendix I (1963) (quoting National Bank Act of 1863, § 59, 12 Stat. 681). The National Bank Act of 1864 added to this language, "'or in any state, county, or municipal court in the county or city in which such association is located, having jurisdiction in similar cases.'" *Id.* at 560, 83 S.Ct. 520 & Appendix II (quoting National Bank Act of 1864, § 57, 13 Stat. 116–17). Section 57 was inadvertently omitted from Section 5198 of the Revised Statutes of 1873 but was reinstated in 1875. *Id.* at 560–61, 83 S.Ct. 520 & Appendix II. This provision was eventually transferred to 12 U.S.C. § 94, where it remained intact until 1982.[6]

The *Monday* Court found the National Bank Act's failure to address the amount in controversy inconsequential because "many federal jurisdictional laws and interpretations changed" after it was enacted. 1997 WL 114874 at *7. The most striking difference between the National Bank Act and the LMRA, however, lies in their treatment of state court jurisdiction; while the LMRA is silent, the National Bank Act expressly contemplates state court jurisdiction. Thus, the National Bank Act's jurisdictional provision varies materially in every respect from the jurisdictional language common to the LMRA and ERISA. Such a jurisdictional provision cannot be said to "closely parallel" the LMRA for purposes of complete preemption analysis.

An additional opinion favoring complete preemption of state law excessive interest claims, although unremarked by the defen-

---

common language that could itself suggest an intent to invoke the extraordinary result of complete preemption. The only common language between the statutes provides simply that the district courts of the United States shall have jurisdiction over certain suits without respect to the amount in controversy or the citizenship of the parties. *Compare* 29 U.S.C. § 185(a) *with id.* § 1132(f).

**6.** Congress labeled and considered Section 94 as a venue provision. In 1982, it was revised to address venue only with respect to actions against national banks in receivership or against the Federal Deposit Insurance Corporation as receiver. *See* 12 U.S.C. § 94.

dants, must be addressed. In *Spellman v. Meridian Bank*, 1995 WL 764548 (3rd Cir. 1995), a panel of the Third Circuit reversed the district court rulings in *Ament v. PNC National Bank* and *Goehl v. Mellon Bank*, holding that complete preemption does not apply to such claims. 1995 WL 764548 at *3–7.[7] Judge Scirica's dissent raises interesting arguments but does not support a finding of complete preemption, especially under Eleventh Circuit law.

Judge Scirica recognized the difficulty of divining a congressional intent to convert state causes of action into federal ones, so as to support federal question removal jurisdiction, from a statute enacted before removal jurisdiction or even federal question jurisdiction existed. 1995 WL 764548 at *21.[8] Judge Scirica's solution to this dilemma was to propose that the bar for establishing congressional intent be lowered with respect to such statutes so that "less clear" evidence of congressional intent would suffice to support complete preemption. *Id.*

This Court can discern no basis for requiring a different or lesser showing of congressional intent for statutes enacted prior to the rise of modern jurisdictional precepts. Complete preemption is to be an "extraordinary" result, even in statutes enacted after *Avco*, and finding complete preemption without clear evidence that Congress intended that specific result

would violate this principle, greatly expanding the occurrence of complete preemption. The inherent implausibility of Congress possessing an intent that presupposes the existence of laws and legal principles that would not be enacted or articulated for years or even decades to come should counsel against finding complete preemption in such cases; it certainly should not justify a more relaxed standard for achieving an "extraordinary" result.[9]

Judge Scirica relied on three considerations in divining adequate evidence of congressional intent: (1) the historical context surrounding passage of the National Bank Act; (2) its provision of an exclusive federal remedy; and (3) judicial indications of a "strong congressional desire for uniform treatment of national banks." 1995 WL 764548 at *21–25. Even if the more forgiving standard of congressional intent advocated by Judge Scirica were appropriate with respect to the National Bank Act, the evidence he marshaled does not demonstrate that it is satisfied.

Expanding on the facts identified by the *Monday* Court, Judge Scirica noted that the National Bank Act was born of the exigencies of civil war. Since the charter of the Second Bank of the United States expired in 1836, the federal government had hoarded most of its own funds, while myriad state chartered banks of dubious stability issued bank notes for circulation.

---

7. The Third Circuit granted rehearing en banc and vacated the panel opinion in *Spellman,* but an intervening Supreme Court ruling determined the underlying substantive issue, the parties resolved their differences, and the appeal was dismissed. *See Artful Pleading,* 76 Tex.L.Rev. at 1799. While the defendants claim that the Third Circuit en banc affirmed *Ament* and *Goehl* without opinion, thereby approving of complete preemption under the National Bank Act, in fact the Court affirmed only one of eleven consolidated appeals. *See Deffner v. Corestates Bank, N.A.,* 92 F.3d 1170 (3rd Cir.1996). As the *Spellman* panel opinion explicitly states, "[t]here is no dispute that jurisdiction was proper in *Deffner v. Corestates Bank* [and two other cases], because those cases all contained federal questions on the face of the plaintiffs' amended complaints." 1995 WL 764548 at *25 n. 6. The trial court in *Deffner* granted the defendant's

motion for judgment for lack of standing, *id.* at *12; it was this ruling that the Third Circuit affirmed en banc.

8. Both founts of jurisdiction derive from the Judiciary Act of 1875. 1995 WL 764548 at *21 n. 8.

9. The Fifth Circuit, while acknowledging that it "might not be entirely appropriate to demand" equivalent specificity of intent from the legislative history of a statute enacted prior to *Avco*, still insisted upon a "clear indication of legislative intent" to engraft complete preemption onto the Longshore and Harbor Workers' Compensation Act. *Aaron v. National Union Fire Insurance Co.,* 876 F.2d 1157, 1165 n. 15 (5th Cir.1989), *cert. denied,* 493 U.S. 1074, 110 S.Ct. 1121, 107 L.Ed.2d 1028 (1990).

The government's need for stable financing of the war effort prompted support for a uniform national currency, which bore fruit in the National Bank Act of 1863. More than simply establishing a rival, national banking system, Congress anticipated that the state bank system would naturally wither away as state banks exchanged their state charters for national ones. When this did not occur, Congress enacted the National Bank Act of 1864, which carried over many provisions of the 1863 Act but added, among others, Section 30 and its provisions concerning interest charges. 1995 WL 764548 at *21–23. Judge Scirica found this historical context to "demonstrat[e] that Congress perceived the enactment of the National Bank Act as essential to the survival of the republic and believed it equally essential to establish a national banking system that was independent of potentially destructive state impulses." *Id.* at *23.

■ The National Bank Act allows national banks to charge the same rate of interest as state banks of the state in which the national bank is located, with the possibility of charging even higher rates than the state banks if state law allows a higher rate to persons or entities other than state banks. *Tiffany v. National Bank of Missouri,* 85 U.S. (18 Wall.) 409, 411, 21 L.Ed. 862 (1873).[10] In upholding this construction of the Act, the *Tiffany* Court described Congress's purpose as follows:

National banks have been national favorites. They were established for the purpose, in part, of providing a currency for the whole country, and in part to create a market for the loans of the general government. It could not have

been intended, therefore, to expose them to the hazard of unfriendly legislation by the states, or to ruinous competition with state banks. On the contrary, much has been done to insure their taking the place of state banks [i.e., the imposition of taxes and duties].

*Id.* at 413. Judge Scirica relied on *Tiffany* for the proposition that "the congressional purpose was to enable national banks to resist potential state parochialism." 1995 WL 764548 at *24. Finally, Judge Scirica noted that the National Bank Act provides an exclusive federal remedy. *Id.*

What may fairly be gleaned from the evidence cited by Judge Scirica is that Congress was distrustful of the state banking system and desired to foster a national banking system. With respect to interest, it placed national banks on an equal, and in some ways superior, footing as compared with state banks. By setting federal standards for interest charged by national banks and establishing a federal remedy for their violation, Congress ensured that "unfriendly legislation by the States" concerning interest rates could not cripple the fledgling industry.

What the evidence does not demonstrate is that Congress was so distrustful of the states' *judicial* systems that it desired the "uniform treatment" of national banks to include federal jurisdiction in all cases involving claims of excessive interest. Because there was no such creature as removal jurisdiction in 1864, Congress necessarily recognized that claims against national banks for excessive interest—even if expressly based on the National Bank Act—would remain in state court if filed in state court. Congress had the power to preclude state court jurisdiction of such claims,[11] but elected not to exer-

---

**10.** The Act similarly allows a national bank to charge rates legal in the state in which it is located, even if such rates are illegal in the other states in which the national bank does business. *Marquette National Bank v. First of Omaha Service Corp.,* 439 U.S. 299, 313–18, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978).

**11.** "Unquestionably Congress had authority to prescribe the manner and circumstances un-

der which the banks could sue or be sued in the courts...." *Mercantile National Bank v. Langdeau,* 371 U.S. at 559, 83 S.Ct. 520. The 1863 Act did not expressly provide for concurrent state court jurisdiction and, "[i]f the law had remained in this form, there might well have been grave doubt about the suability of national banks in the state courts." *Id.;* see also *First National Bank v. Morgan,* 132

cise this prerogative. On the contrary, Congress expressly provided for state court jurisdiction of such claims, concerning itself only with identifying specific venues within the state judicial system. A Congress willing for national banks to be sued in state courts for violating the interest provisions of the National Bank Act, without hope of a federal forum, could not have desired that all national bank defendants accused under state law of charging excessive interest have access to a federal forum—the precise result of complete preemption.

Whatever the merits of Judge Scirica's analysis under Third Circuit law, this Court is bound by Eleventh Circuit precedent. The *Blab T.V.* Court has made clear that neither the provision of an exclusive federal remedy nor the explicit desire to encourage the development of federal case law furnishes an adequate basis for concluding that Congress intended the extraordinary result of complete preemption. 182 F.3d at 858. The weaker evidence of congressional intent marshaled by Judge Scirica must necessarily fall short of that required by the Eleventh Circuit.

In summary, application of the analysis required by the Supreme Court and the Eleventh Circuit demonstrates that the National Bank Act does not completely preempt state law claims for excessive interest so as to support federal question removal jurisdiction. *See, e.g., Partin v. Cableview, Inc.,* 948 F.Supp. 1046, 1049–50 (S.D.Ala.1996). Even if there were any question about the matter, "all doubts about jurisdiction should be resolved in favor of remand to state court." *University of South Alabama v. American Tobacco Co.,* 168 F.3d 405, 411 (11th Cir.1999); *see also Metropolitan Life v. Taylor,* 481 U.S. at 68, 107 S.Ct. 1542 (Brennan, J., concurring) ("In future cases involving other statutes, the prudent course for a federal court that does not find a clear congressional intent to create removal jurisdiction will be to remand the case to state court.").

U.S. 141, 144, 10 S.Ct. 37, 33 L.Ed. 282 (1889).

## CONCLUSION

For the reasons set forth above, the plaintiff's motion to remand is **granted.** This action is hereby **remanded** to the Circuit Court of Escambia County, Alabama.

It is so **ORDERED.**