**Joseph A. FLANNICK, Plaintiff,**

v.

**FIRST UNION HOME EQUITY BANK, Defendant.**

**Civil Action No. 98–6080.**

United States District Court,
E.D. Pennsylvania.

Feb. 15, 2001.

Daniel B. Allanoff, Meredith & Cohen, Philadelphia, PA, Michael D. Gottsch, Chimicles, Jacobsen & Tikellis, Haverford, PA, James R. Malone, Jr., Pamela N. Zetterberg, Chimicles & Tikellis, LLP, Haverford, PA, for plaintiffs.

E. Thomas Henefer, Stevens and Lee, Reading, PA, Russell J. Pope, Pope & Hughes, Townson, MD, for defendant.

*MEMORANDUM AND ORDER*

SCHILLER, District Judge.

Before this court is Plaintiff's Motion for Class Certification and Defendant's Motion for Summary Judgment in the above-captioned matter. For the reasons set forth below I deny Defendant's Motion and Certify the Class.

### I. Facts

Plaintiffs Joseph and Linda Flannick applied for a home equity loan with Defendant First Union Home Equity Bank ("First Union"), a national bank which is headquartered in North Carolina and which operates no branch offices outside of that State.[1] At the closing on Wednesday, February 26, 1997, Plaintiffs signed a note and mortgage for $300,000 with interest accruing on the unpaid principal amount at a rate of 7.99%. The fixed rate note called for the payment of interest "from the date of this note." Def.Mot.Summ.J., Exh. B at 1. Plaintiffs executed a "Notice of Right to Cancel" which provided the necessary disclosure required by the Truth in Lending Act ("TILA"), 15 U.S.C. § 1601, *et seq.* Under TILA, the plaintiffs had the right to cancel the loan within 3 days of the February 26 closing. *See* 15 U.S.C. § 1635(a). On Friday, February 28, First Union wire-transferred the funds for the loan to the settlement agent. The three-day TILA period expired at midnight on Saturday, March 1. On Monday, March 3, the settlement agent disbursed the funds to the plaintiffs. *See* Compl. at 2.

Plaintiffs were charged a total of $197.01 in interest that accrued between the time the funds were sent by First Union to the escrow agent on February 28, and the time the funds were disbursed to the plaintiffs on March 3. Plaintiffs claim that the charging of interest on the funds prior to disbursement is in violation of the National Bank Act. *See* 12 U.S.C. § 86.

I will first consider the Defendant's Motion for Summary Judgment and then Plaintiff's Motion for Class Certification.

### II. Defendant's Motion for Summary Judgment

Defendant argues in its Motion for Summary Judgment that the Depository Institution Deregulation and Monetary Control Act of 1980 ("Monetary Control Act"), *see* 12 U.S.C. § 1735f-7 *et seq.,* governs the loan made to the Flannicks. First Union then argues that even if the Monetary Control Act does not apply in this situation, the National Bank Act, *see* 12 U.S.C. § 86, allows Defendant to charge interest under either North Carolina or Pennsylvania law. Finally, in the event that the Monetary Control Act does not apply, and the National Bank Act mandates the use of North Carolina law, Defendant claims that North Carolina law does not preclude the charging of interest prior to disbursement to the borrowers. I shall examine each argument separately.

### A. The Standards Governing Summary Judgment

Summary judgment is granted when the record reveals that no genuine issue of material fact exists for resolution at trial, and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c). The moving party bears the burden of demonstrating the absence of issues of material fact. *See Celotex Corp. v. Catrett,*

---

1. First Union processes loan applications at "loan production offices" located outside of North Carolina. Defendant concedes that the "loan production offices" are not branch offices. *See* Trans. of Hearing on Mot. for Summ.J., at 29.

477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The party opposing the motion for summary judgment is entitled to have its allegations taken as true and to receive the benefit of the doubt when its assertions conflict with those of the movant. *See Big Apple BMW v. BMW of N. Am. Inc.,* 974 F.2d 1358, 1362–63 (3d Cir.1992).

## B. The Monetary Control Act

■ The Defendant relies on Section 501 of the Monetary Control Act, enacted in 1980, in arguing that the statute totally preempts any state law and applies to the loan issued by First Union to the Flannicks. *See* 12 U.S.C. § 1735f–7, *et seq.* The applicable terms of the Monetary Control Act provide that:

The provisions of the Constitution or the laws of any State expressly limiting the rate or amount of interest, discount points, finance charges or other charges, which may be charged, taken, received or reserved shall not apply to any loan, mortgage, credit sale or advance which is—

(A) secured by a first lien on a residential real property ...;

(B) made after March 31, 1980; and

(C) described in § 527(b) of the National Housing Act.

12 U.S.C. § 1735f–7a.[2]

The Monetary Control Act, however, contains an override provision. The provision expressly allows states within three years of April 1, 1980, to declare that they do not wish to be bound by the Act's preemption of their state usury laws. *See* 12 U.S.C. § 1735f–7a(b)(2). North Carolina is one of the fifteen states that chose to opt out of the Monetary Control Act.

*See* N.C.Gen.Stat. § 24–2.3 (2000). The North Carolina opt out provision states:

(a) the provisions of section 501, of United States Public Law 96–221, as well as any modifications made to date, shall not apply to loans, mortgages, credit sales and advances made in this State.

N.C.Gen.Stat. § 24–2.3.

Defendant seeks to avoid the North Carolina opt out by arguing that the loan made to the Flannicks was made in Pennsylvania, not North Carolina, and that the opt out does not apply because it only affects loans made "in this State." *Id.* However, a national bank is restricted to transacting business "in the place specified in its organization certificate and in the branch or branches, if any, maintained by it ..." 12 U.S.C. § 81. First Union, as a national bank located in North Carolina, with no branch offices outside of that State, made the loan to the Flannicks in North Carolina, regardless of the location of the borrowers or of the property that is the subject of the loan. Because the loan to the Flannicks was made in the State of North Carolina, the Monetary Control Act is not applicable.

## C. The National Bank Act

■ Defendant argues that Section 85 of the National Bank Act, as an enabling statute, permits but does not mandate a national banking association such as First Union to export the law of the jurisdiction where it is "located" to the jurisdiction where the loan is made. A national bank is located in the State where it has its main office (the State designated in its organization certificate), *see Marquette Nat'l Bank of Minneapolis v. First of*

---

**2.** It is undisputed that the Flannicks' loan meets all three prerequisites outlined in 12   U.S.C. § 1735f–7a.

*Omaha Serv. Corp.,* 439 U.S. 299, 309–12, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978), and in a State where a branch is located. *See* 12 U.S.C. § 36(j).[3] Under Defendant's interpretation of the National Bank Act, First Union would be entitled to charge interest according to Pennsylvania law on the loan entered into with the Flannicks. According to First Union, Pennsylvania does not bar the charging of interest on loan funds prior to the disbursement of those funds.

The applicable part of Section 85 reads:

Any association may take, receive, reserve, and charge on any loan or discount made, or upon any notes, bills of exchange or other evidences of debt, interest at the rate allowed by the laws of the State, Territory or District where the bank is located ... and no more, except that where by the laws of any State a different rate is limited for Banks organized under State laws, the rate so limited shall be allowed for associations organized or existing in any such State under Title 62 of the Revised Statutes.

12 U.S.C. § 85.

■ In claiming that it is entitled to charge interest under the statutory scheme of either North Carolina or Pennsylvania, First Union maintains that, while it is located in North Carolina, it also "exists" in Pennsylvania, where it was contacted by the Plaintiffs at a loan processing office. According to the Defendant, the words "organized or existing in any such State" in Section 85 refer to banks which do business in states in which they are not located. First Union alleges that it "exists" for purposes of Section 85 in Pennsylvania by virtue of its Pennsylvania loan production offices. *See* Def.Mot. for Summ.J. at 11.

Defendant primarily relies on two cases to support its claim that it is "existing" in Pennsylvania for purposes of Section 85. In *Fisher v. First Nat'l Bank of Chicago,* 538 F.2d 1284 (7th Cir.1976) [*Fisher I* ], the Seventh Circuit Court of Appeals examined the case of a national bank located in Illinois extending credit to a credit card holder residing in Iowa. The credit card holder brought a class action suit on behalf of all of the bank's customers within the state of Iowa, claiming that the bank's 18% annual interest rate, the maximum allowable in Illinois, was usurious under Iowa law. In interpreting Section 85 of the National Bank Act, the court stated that the statute clearly allowed for the charging of the 18% annual interest rate allowable under Illinois law. *See Fisher,* 538 F.2d at 1289. While recognizing that the Chicago National Bank "does business" in Iowa through the extension of credit via its credit cards, *see id.,* the court specifically declined to decide whether the bank "existed" in Iowa for purposes of Section 85, stating that "the defendant bank appears to 'exist' in Iowa, although in our view of the case we need not determine whether it does or not." *Id.* at 1291. The Seventh Circuit summarized Section 85 as it applied to the situation before it as:

Illinois' 18% per annum statute applies to all loans made by the defendant Illinois national banking association, whether made in Illinois or elsewhere, but if the defendant is "existing" in Iowa and if Iowa allowed, which it apparently does not, a rate of interest to its own state banks in excess of 18%, the defendant could charge such higher rate to the defendant's customers in Iowa.

*Id.* Thus, the Seventh Circuit declined to state whether First National Bank of Chi-

---

**3.** Neither party disputes that First Union is located in the State of North Carolina and that First Union has no branch offices outside of that State.

cago "existed" in Iowa for purposes of Section 85.

In *Fisher v. First Nat'l Bank of Omaha*, 548 F.2d 255 (8th Cir.1977) [*Fisher II*], the same plaintiff brought a class action suit under the National Bank Act against a national bank located in Nebraska, which was extending credit to out of state borrowers through its credit-card program. The court relied on *Fisher I* in holding that a national bank located in one state but "doing business" in another state in which the maximum allowable interest rate for the same class of debt is different, may charge the higher of the two rates. *See Fisher II*, at 257–58. The Eighth Circuit side-stepped the issue of whether the Nebraska bank "existed" in Iowa, stating only that First National Bank of Omaha was "doing business" in Iowa through the extension of credit to Iowa borrowers. *See id.* The Eighth Circuit's reading of *Fisher I* appears to be a misinterpretation of the Seventh Circuit's holding regarding Section 85 of the National Bank Act. As noted above, the court in *Fisher I* expressly declined to rule on the issue of whether the national bank located in Illinois and extending credit to borrowers in Iowa "existed" in Iowa for purposes of Section 85. *See Fisher I*, at 1291. It therefore also declined to rule on the issue of whether the national bank located in Illinois could charge the maximum permissible interest rate in Iowa, had that rate been higher than the maximum permissible interest rate in Illinois. *See id.*

Notably, the Supreme Court has expressly declined to interpret the statutory language that is at issue here. In *Marquette Nat'l Bank of Minneapolis v. First of Omaha Serv. Corp.*, 439 U.S. 299, 99 S.Ct. 540, 58 L.Ed.2d 534 (1978), a Minnesota-chartered national bank (Marquette) brought suit against a national bank chartered in Nebraska (First of Omaha), claiming that the Nebraska-chartered bank was placing the plaintiff at a disadvantage by charging the rate of interest allowed by Nebraska law to credit card customers in Minnesota. As a Minnesota-chartered national bank, Marquette could only charge the maximum rate of interest allowed under Minnesota law. Marquette sought a declaration that First of Omaha was in violation of Minnesota law and an injunction compelling First of Omaha to comply with Minnesota law when soliciting business in that State. *See Marquette*, 439 U.S. 299, at 304–05, 99 S.Ct. 540. The Court limited its holding to a determination that a national bank is "located" in the State named in its organization certificate. *See id.* at 311, 99 S.Ct. 540. The Court stated that "[w]e have no occasion in this case to parse the meaning of the phrase in Section 85 'associations organized or existing in any such State ...' ... [and] need not determine the relationship of the phrase 'organized or existing' to the term 'located.' " *See id.* at 308 n. 19, 99 S.Ct. 540.

As the Supreme Court has declined to rule on the meaning of the phrase "organized or existing," and because the *Fisher* cases neglected to resolve the issue, this court has the opportunity to examine the meaning of "existing" under the National Bank Act as a case of first impression. I conclude that it is highly unlikely that First Union "exists" in Pennsylvania for purposes of Section 85 simply by virtue of the fact that it makes loans to Pennsylvania residents for the purchase of Pennsylvania property through its "loan production offices." An examination of the history and structure of the National Bank Act inevitably leads to this conclusion.

During the Civil War, Congress passed the National Currency Act of 1863 ("1863 Act") which was replaced the following

year by the National Bank Act of 1864 ("1864 Act"), now codified as 12 U.S.C. § 83 *et seq. See Mercantile National Bank at Dallas v. Langdeau,* 371 U.S. 555, 559 n. 4, 83 S.Ct. 520, 9 L.Ed.2d 523 (1963). Section 46 of the National Currency Act of 1863, the predecessor to 12 U.S.C. Section 85, provided:

> "[E]very association may take, reserve, receive, and charge on any loan, or discount made, or upon any note, bill of exchange, or other evidence of debt, such rate of interest or discount as is for the time the established rate of interest for delay in the payment of money, in the absence of contract between the parties, by the laws of the several States in which associations are respectively located, and no more . . ."

12 Stat. 678.

Congress replaced the National Bank Act of 1863 just one year later with the National Bank Act of 1864. In order to assure that national banks formed under the 1863 Act would enjoy the same privileges as national banks formed under the 1864 Act, Congress included a specific provision (Section 62) that addressed the status of banks formed under the earlier act:

> Nothing in title 62 of the Revised Statutes shall affect any appointments made, acts done, or proceedings had or commenced prior to the third day of June 1864, in or toward the organization of any national banking association under the act of February 25, 1863; but *all associations which, on the third day of June 1864, were organized or commenced to be organized under that act, shall enjoy all the rights and privileges granted, and be subject to all the duties, liabilities, and restrictions imposed by title 62 of the Revised Statutes,* notwithstanding all the steps prescribed by title 62 of the Revised Statutes for the organizations of associations were not pur-

sued, if such associations were duly organized under that act.

12 U.S.C. § 39 (emphasis added).

When Congress enacted the Revised Statutes, it changed the language of Section 30 of the 1864 Act to the following:

> Any association may take, receive, reserve and charge on any loan or discount made, or upon any notes, bills of exchange, or other evidence of debt, interest at the rate allowed by the laws of the State, Territory, or district where the bank is located, and no more, except that where by the laws of any State a different rate is limited for banks of issue organized under State laws, the rate so limited shall be allowed for associations *organized or existing in any such State under this Title.*

Rev.Stat. § 5197. This court concludes that the reference to "associations organized or existing in any such State" was meant to guarantee the same status under state law provided to national banks organized under the 1864 Act to those banks already "existing" under the earlier act.

■ First Union's argument that a bank is "existing" wherever it does business is not only inconsistent with the history of Section 85, it is also inconsistent with principles of statutory construction. A statute should be construed to account for the full text, *see United States National Bank of Oregon v. Indep. Ins. Agents of America, Inc.,* 508 U.S. 439, 455, 113 S.Ct. 2173, 124 L.Ed.2d 402 (1993), and to give effect to all terms and avoid surplusage. *See United States v. Johnson,* 462 F.2d 423, 428 (3d Cir.1972), *cert. denied,* 410 U.S. 937, 93 S.Ct. 1396, 35 L.Ed.2d 602 (1973). If a national bank "existed" in every state in which a borrower resided or in which the bank was doing business in some way, Section 85's reference to the bank's "location," would become irrelevant.

I conclude that the National Bank Act fails to allow Defendant to make the loan at issue under the interest regulating statutes of Pennsylvania. Under the National Bank Act loans made by First Union are governed by North Carolina law.

## D.   The North Carolina Statute

First Union claims that even if the Monetary Control Act does not apply, and the National Bank Act does not allow First Union Home Equity Bank to charge interest under the Pennsylvania statutory framework, North Carolina law does not bar it from charging interest from the date defendant wire-transferred the funds to the settlement agent.

■ In bringing suit, the Flannicks have relied on chapter 24 of the North Carolina General Statutes which regulates the charging of interest on loans. *See* N.C.Gen.Stat. § 24 (2000). In particular, Plaintiffs rely on section 24–1.1, entitled "Contract rates and fees," the relevant part of which states:

> (b) As used in this section, interest shall not be deemed in excess of the rates provided where interest is computed monthly on the outstanding principal balance and is collected not more than 31 days in advance of its due date. *Nothing in this section shall be construed to authorize the charging of interest on committed funds prior to the disbursement of said funds.*

N.C.Gen.Stat. § 24–1.1(b) [emphasis added].

Defendant claims, first, that the loan extended to the Flannicks is actually governed by section 24–1.1A, instead of section 24–1.1. Section 24–1.1A is entitled "Contract rates on home loans secured by first mortgages or first deeds of trust." N.C.Gen.Stat. § 24–1.1A. Defendants point the court to the portion of section 24–1.1A that states:

> (a) Notwithstanding any other provision of this Chapter, but subject to the provisions of G.S. 24–1.1E parties to a home loan may contract in writing as follows:
>
> (1) Where the principal amount is ten thousand dollars ($10,000) or more the parties may contract for the payment of interest as agreed upon by the parties;

N.C.Gen.Stat. § 24–1.1A. The defendants rely on the words "notwithstanding any other provision of this Chapter" to claim that section 24–1.1A overrides section 24–1.1 to allow the parties to a loan to "contract for the payment of interest as agreed upon by the parties." However, section 24–1.1A is silent as to when a bank may begin to charge interest on a loan. The section pertains to the rate that may be charged, not to the point at which the charging of interest may be commenced. *See* N.C.Gen.Stat. § 24–1.1A. Section 24–1.1A does not nullify other statutory provisions that govern aspects of a loan transaction to which the section is not addressed. Therefore, section 24–1.1A does not preempt section 24–1.1(b)'s provision precluding banks from charging interest prior to disbursement.

■ Defendants' alternative argument is that section 24–1.1(b) is rendered moot by section 24–1.1(a) which reads:

> (a) Except as otherwise provided in this Chapter or other applicable law, the parties to a loan, purchase money loan, advance, commitment for a loan or forbearance other than a credit card, open-end, or similar loan may contract in writing for the payment of interest not in excess of:
>
> (1) Where the principal amount is twenty-five thousand dollars ($25,000) or less, the rate set under subsection (c) of this section; or
>
> (2) *Any rate agreed upon by the parties where the principal amount is more*

*than twenty-five thousand dollars ($25,-000).*

N.C.GenStat. § 24–1.1(a) [emphasis added]. According to defendants, section 24–1.1(a)(2), which allows the parties to a loan in excess of $25,000 to agree upon any rate of interest, would take precedence over section 24–1.1(b)'s "Nothing in this section shall be construed to authorize the charging of interest on committed funds prior to the disbursement of said funds." N.C.Gen.Stat. § 24–1.1(b). The fact that the relevant sentence in section 24–1.1(b) begins with the words *"Nothing in this section ... "* shows that the drafters of Section 24–1.1 intended the admonition against charging interest before disbursement in 24–1.1(b) to take precedence over language in any other subsection of section 24–1.1. Section 24–1.1 must be read to disallow the charging of interest before the disbursement of funds.[4]

■ Defendant claims that even if section 24–1.1 is read to disallow the charging of interest on funds prior to disbursement, "disbursement" occurred when First Union wired the funds to the escrow agent, not when the Flannicks finally received the funds. "Disbursement" is defined in North Carolina's Good Funds Settlement Act, which governs the distribution of funds and the duties of borrowers and lenders in connection with a loan secured by residential property. *See* N.C.Gen. Stat. § 45A–1. According to the definitions section of the statute:

"Disbursement of settlement proceeds" means the payment of all closing funds from the transaction by the settlement

agent to the persons or entities entitled to that payment.

N.C.Gen.Stat. § 45A–3. As Defendant notes, however, the Good Funds Settlement Act also makes reference to "disbursement to the settlement agent:"

"[I]n the case of a refinancing, or any other loan where a right of rescission applies, the lender shall, no later than the business day after the expiration of the rescission period required under the federal Truth–in–Lending Act, 15 U.S.C. § 1601, et seq., cause disbursement of loan funds to the settlement agent in one or more of the forms prescribed by provisions in this Chapter."

N.C.Gen.Stat. § 45A–5. Defendant argues that because the Flannicks' loan is a refinancing, the "disbursement" spoken of in section 41.1(b) should be read to mean distribution of the funds from the lender to the settlement agent. This court is not convinced that Defendant's proposed reading of the statute is a valid one.

Section 45A–5 uses the words "disbursement of loan funds to the settlement agent," to discuss the transfer of funds from the lender to the settlement agent. The statute does not use the term "disbursement" alone, as is the case in section 24–1.1(b) ("disbursement of said funds"). Instead, the words "to the settlement agent" are added to show that this is not the use of the general definition of "disbursement" provided in section 45A–3. *See* N.C.Gen.Stat. 45A–3. In the situation discussed in section 45A–5 it is clear that, although at the beginning of the TILA rescission period funds are "disbursed to the. settlement agent," at the end of the

---

4. Defendant relies on *Morosani v. First Nat'l Bank of Atlanta*, 539 F.Supp. 1171 (N.D.Ga. 1982), *rev'd on other grounds*, 703 F.2d 1220 (11th Cir.1983), in claiming that North Carolina law exempts all loans in excess of $25,000 from that State's usury statutes. *See* *Morosani*, at 1174. *Morosani* provides little guidance, however, as that case involved only the *rate* charged by a lender and as such the court did not consider N.C.Gen.Stat. § 24–1.1(b).

TILA rescission period, the funds will be disbursed, *i.e.*, transferred to the borrower.

Such a reading of the term "disbursement" in section 24–1.1(b) is also consistent with general principles of statutory interpretation. Words within a statute must be interpreted within the framework in which they appear. *See Nat'l Bank of Oregon*, 508 U.S. at 439, 113 S.Ct. 2173. "[T]ext consists of words living 'a communal existence,' in Judge Learned Hand's phrase, the meaning of each word informing the others and 'all in their aggregate tak[ing] their purport from the setting in which they are used.'" *Id.* at 454, 113 S.Ct. 2173 (quoting *NLRB v. Federbush Co.*, 121 F.2d 954, 957 (2d Cir.1941)). Section 24–1.1 regards the relationship between the "parties to a loan," *i.e.* the lender and the borrower. Nowhere in Section 24–1.1 is a settlement agent or the funneling of funds through such an agent referred to. Therefore, the most natural reading of "disbursement" within the framework of section 24–1.1 is distribution of funds to the borrower.

Further bolstering this interpretation of the word "disbursement" in Section 24–1.1 is First Union's own use of the word in an instruction letter it sent to the settlement agent involved in the loan transaction with the Flannicks. The instruction letter states: "We will wire $293,891.90 to your

escrow account for the benefit of the borrower(s) with the disbursement to be made after the expiration of any rescission period." Pl. Reply Brief in Supp. of Mot. for Class Cert., Exh. 3 at 2. "Disbursement" clearly refers to the transfer of funds from the settlement agent to the borrowers.

North Carolina law therefore bars the charging of interest on funds prior to disbursement to the borrower. Under North Carolina Law, First Union was not entitled to charge interest on the Flannicks' loan until March 3, 1997, when the funds were disbursed to the Flannicks.[5]

Because Defendant has failed to meet its burden of establishing the absence of issues of material fact, *see Celotex*, 477 U.S. 317, 323, 106 S.Ct. 2548, Defendant's Motion for Summary Judgment is denied.

### III. Plaintiff's Motion for Class Certification

Plaintiffs seek certification of the class of all persons who, from November 17, 1996, through November 17, 1998, entered into mortgage loans with First Union Home Equity Bank, N.A. and who were charged interest by First Union Home Equity for a period preceding the date when the loan proceeds were disbursed.

A class action may be maintained when it satisfies all requirements of Fed. R.Civ.P. 23(a) and at least one of the requirements of Rule 23(b). See *Eisen v.*

---

5. Defendant First Union Home Equity Bank also argues that the practice of charging interest during the three-day rescission period mandated by TILA, *see* 15 U.S.C. § 1635(a), is expressly permitted by federal law. Plaintiff relies on the following Official Commentary that accompanies TILA's implementing regulation:

> The creditor may disburse advances during the rescission period in a valid escrow arrangement . . .
> Section 226.15(c) does not prevent the creditor from taking other steps during the delay . . .

> Unless otherwise prohibited, such as by state law, the creditor may, for example . . . accrue finance charges during the delay period.

Federal Reserve Board Official Staff Interpretations, 12 C.F.R. Part 226 Supplement I, 15(c)(2), 15(c)(3).

While the regulation permits the accrual of interest during the delay period, it specifically allows for the preemption of such a right by state law. As noted above, section 24–1.1 of the North Carolina General Statutes bars such an accrual of interest. *See* N.C.Gen. Stat. § 24–1.1(b).

*Carlisle & Jacquelin,* 417 U.S. 156, 163, 94 S.Ct. 2140, 40 L.Ed.2d 732 (1974). Rule 23(a) provides:

> One or more members of a class may sue or be sued as representative parties on behalf of all only if (1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interest of the class.

Fed.R.Civ.P. 23(a).

Plaintiffs seek class certification under Rule 23(b)(3) under which the court must find that "the questions of law or fact common to the members of the class predominate over any questions affecting only individual members and the class action is superior to other available methods for the fair and efficient adjudication of the controversy." Fed.R.Civ.P. 23(b)(3).

The Plaintiffs have the burden of setting forth sufficient factual information to enable the court to consider each element. *See Baby Neal v. Casey,* 43 F.3d 48, 55 (3d Cir.1994).

## A. The Numerosity Requirement of Rule 23(a)(1)

■ Rule 23(a)(1) requires that the proponent of a class action demonstrate that "the class is so numerous that joinder of all members is impracticable." Fed. R.Civ.P 23(a)(1). Joinder of all members is impracticable when the procedure would be "inefficient, costly, time-consuming, and probably confusing." *Ardrey v. Federal Kemper Ins. Co.,* 142 F.R.D. 105, 111 (E.D.Pa.1992). Precise enumeration of the members of a class is not necessary, *see Fry v. Hayt, Hayt & Landau,* 198 F.R.D. 461, 465 (E.D.Pa.), and the court is entitled to make common sense assumptions in or-

der to support a finding of numerosity. *See Snider v. Upjohn Co.,* 115 F.R.D. 536, 539 (E.D.Pa.1987). Given First Union's size and prominence in the home equity business it is likely that hundreds, if not thousands, of borrowers fall within the definition of the class. The numerosity requirement is therefore easily satisfied.

## B. The Commonality Requirement of Rule 23(a)(2)

■ Under Rule 23(a)(2), plaintiffs must show the existence of "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). The commonality requirement is satisfied if the named plaintiffs "share at least one question of fact or law with the grievances of the prospective class." *Cullen v. Whitman Med. Corp.,* 188 F.R.D. 226 (E.D.Pa.1999). A common question is one which arises from a common nucleus of operative facts regardless of whether "the underlying facts fluctuate over the class period and vary as to individual claimants." *Cohen v. Uniroyal, Inc.,* 77 F.R.D. 685, 690–91 (E.D.Pa.1977).

Here, First Union Home Equity Bank has engaged in standardized conduct toward putative class members. The Defendant has charged interest on mortgage loan funds prior to the disbursement of those funds. The fact that the Fixed Rate Note signed by the Flannicks is a standardized form on which the Flannicks agreed to pay "interest on the unpaid principal balance from the date of this Note" creates a question of law or fact common to the class. Def.Resp. to Pl.Mot. for Class Cert., Exh. E at 1. While underlying facts such as the exact amount of money borrowed might vary as to individual claimants, all members of the purported class have paid interest from the date of their respective notes executed with First Union.

The Defendant claims that questions of law or fact common to the class do not exist because of a lack of uniformity among the States regarding rules on when disbursement occurs and from what point the bank may charge interest. This court having determined both that North Carolina law governs mortgage loans issued by First Union, and that North Carolina law prohibits the charging of interest prior to disbursement of the funds, the Defendant's claim of lack of commonality cannot stand. Plaintiffs have met their burden of showing the existence of questions of law or fact common to the class.

### C. The Typicality Requirement of Rule 23(a)(3)

█ Rule 23(a)(3) requires that the claims of the representatives be "typical of the claims ... of the class." Fed.R.Civ.P. 23(a)(3). Cases challenging the same conduct that affects both the named plaintiffs and the rest of the putative class usually satisfy the typicality requirement, despite disparities in individual factual scenarios. *See Cullen,* 188 F.R.D. at 230. Typicality does not require that the claims of class members be identical, only that the harm complained of be common to the class. *See Hassine v. Jeffes,* 846 F.2d 169, 177 (3d Cir.1988); *Eisenberg v. Gagnon,* 766 F.2d 770, 786 (3d Cir.1985). Typicality is often demonstrated where a plaintiff can show that "the issues of law or fact he or she shares in common with the class occupy the same degree of centrality to his or her claims as to those of unnamed class members." *Weiss v. York Hosp.,* 745 F.2d 786, 809 n. 36 (3d Cir.1984).

The Flannicks are typical members of the purported class. Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the putative class members. The Flannicks claim that they were charged interest on mortgage loan funds prior to disbursement of those funds in violation of the National Bank Act. Each putative class members' claim is precisely the same. The issues of law or fact share the same degree of centrality to the named representatives' claims such that the Flannicks can reasonably be expected to advance the interests of all putative class members.

### D. The Adequacy Requirement of Rule 23(a)(4)

█ Pursuant to Rule 23(a)(4) the Flannicks must adequately protect the interest of the class sought to be certified. Fed.R.Civ.P. 23(a)(4). The requirements of the rule are met if (1) plaintiffs' interests are not antagonistic to those of other members of the class he or she seeks to represent, and (2) plaintiffs' representatives are qualified, experienced and able to conduct the litigation. *See Wetzel v. Liberty Mut. Ins. Co.,* 508 F.2d 239, 247 (3d Cir.1975), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975).

There is no evidence that the Flannicks have interests that are antagonistic to those of other members of the purported class. Defendant has challenged Mr. Flannick's adequacy based on his alleged inability to describe with certainty the other members of the purported class. *See* Def.Resp. to Pl.Mot. for Class Cert. at 17–20. However, Rule 23 does not require the class representative to have a complete mastery of all details of the case. *See Barnes v. Am. Tobacco Co., Inc.,* 176 F.R.D. 479, 485 (E.D.Pa.1997), *aff'd,* 161 F.3d 127 (3d Cir.1998), *cert. denied,* 526 U.S. 1114, 119 S.Ct. 1760, 143 L.Ed.2d 791 (1999). Furthermore, contrary to Defendant's assertions, Mr. Flannick is able to intelligently articulate the issues involved in this class action, having described his claim as being based upon "... First Un-

ion ... charging interest on money prior to the time in which I have use of those funds," Flannick Dep. at 90: 21–23, and having described the purported class as anyone in "similar circumstances." Flannick Dep. at 103: 16–22. The Flannicks have retained counsel highly experienced in class action litigation to prosecute their claims and those of the class. The Flannicks therefore meet the adequacy requirements of Rule 23(b)(4).

### E. The Requirements of Rule 23(b)(3)

■ In addition to meeting the requirements of Rule 23(a), a class action must satisfy at least one of the requirements of Rule 23(b). *See* Fed.R.Civ.P 23(b). Plaintiffs bring this action under Rule 23(b)(3) which provides:

> (3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3).

Because the court has found that the National Bank Act and North Carolina Law govern all mortgage loans issued by First Union, and because First Union uses standardized forms to enter into agreements with borrowers, it is clear that questions of law or fact common to the members of the class predominate over any questions affecting only individual members. *See Zacharjasz v. Lomas & Nettleton Co.*, 1988 WL 54066, *3, 1988 U.S.Dist. LEXIS 4957, *11 (E.D.Pa. May 23, 1988); *Hanrahan v. Britt*, 174 F.R.D. 356 (E.D.Pa.1997). A common course of conduct such as that pursued by First Union undoubtedly satisfies the predominance requirement. *See In re Prudential Ins. Co. of America Sales Practices Litig.*, 962

F.Supp. 450, 512–14 (D.N.J.1997), *aff'd*, 148 F.3d 283 (1998).

■ There can be little doubt that the class action is the superior method of resolving the claim the Flannicks seek to prosecute. The alternative to a class action would be a number of actions by plaintiffs scattered across the country. Such an alternative would be an inefficient allocation of public and judicial resources. *See Lake v. First Nationwide Bank*, 156 F.R.D. 615, 626 (E.D.Pa.1994). In addition, because the individual claims of members of the purported class are for amounts in the hundreds of dollars, the injured parties would be unlikely to bear the significant litigation expenses involved in suing First Union on an individual basis. *See id.* at 626; *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985). Class actions were intended to provide a remedy to just such a problem; small claims unlikely to be brought due to the expense of litigation exceeding the potential recovery. *See Ralston v. Zats*, 2000 WL 1781590, at *8. A class action is therefore "superior to other available methods for the fair and efficient adjudication of the controversy." Fed. R.Civ.P. 23(b)(3).

Plaintiffs have met all of the requirement of Rule 23(a) as well as the requirements of Rule 23(b)(3), entitling them to certification of the class. An order follows.

### ORDER

AND NOW, this 14 day of February, 2001 it is ORDERED:

1. Upon consideration of Defendant's Motion for Summary Judgment and Plaintiffs' response thereto, Defendant's motion is hereby DENIED.

2. Upon consideration of the Motion of Plaintiffs for Class Certification, the response of the Defendants and the record

herein, the Court having concluded that the requirements of Rule 23(a) and 23(b)(3) of the Federal rules of Civil Procedure have been met, it is hereby ORDERED as follows:

a. Plaintiffs' Motion for Class Certification is hereby granted and the following class is hereby certified: all persons who, from November 17, 1996 through November 17, 1998, entered into mortgage loans with First Union Home Equity Bank, N.A., and who were charged interest by First Union Home Equity Bank for a period preceding the date when the loan proceeds were disbursed. (The "Class").

b. Plaintiffs Joseph A. Flannick and Linda C. Flannick are hereby designated as the representatives of the Class, and the law firms of Chimicles & Tikellis, LLP and Meredith, Cohen, Greengfogel & Skirnik, P.C. are hereby appointed as counsel for the Class.

c. The parties are hereby directed to confer with respect to the preparation and dissemination of an appropriate form of notice to the Class in accordance with the requirements of Rule 23(c)(2). Within thirty (30) days of this Order, the parties shall either file a joint proposal with respect to notice, or Plaintiffs shall file a motion for approval of a proposed form of notice and a proposal for dissemination of notice to the Class.